467 So.2d 798 (1985)
SOUTH FLORIDA BLOOD SERVICE, INC., Petitioner,
v.
Donald RASMUSSEN, Respondent.
No. 84-1403.
District Court of Appeal of Florida, Third District.
April 23, 1985.
*799 Blackwell, Walker, Gray, Powers, Flick & Hoehl and James C. Blecke, Miami, for petitioner.
Bender, Bender & Chandler and George Bender, Coral Gables, for respondent.
O'Connor & Hannan and H. Robert Halper and Christina W. Fleps, Washington, D.C. for Council of Community Blood Centers as amicus curiae.
*800 Before SCHWARTZ, C.J., and BARKDULL and NESBITT, JJ.
NESBITT, Judge.
South Florida Blood Service, Inc. (SFBS) seeks review, by way of a petition for certiorari, of an order requiring it to produce the names and addresses of fifty-one volunteer blood donors. We grant the petition and quash the order under review.[1]
Donald Rasmussen has sued William DeLoatche and Leonel Levia Monterroso for personal injuries sustained when struck by a motor vehicle allegedly owned and operated by the defendants. It is that litigation which has led to the issue we must resolve.[2]
Rasmussen, while hospitalized because of the injuries he sustained in the accident, received fifty-one units of blood. He was subsequently diagnosed as having acquired immune deficiency syndrome (AIDS). Based on that diagnosis, and the opinion of a physician that the AIDS resulted from the transfusions received while hospitalized, Rasmussen served a subpoena duces tecum on SFBS. The subpoena sought "any and all records, documents and other material indicating the names and addresses of the blood donors identified on the attached records of St. Francis Hospital regarding the plaintiff herein, Donald Rasmussen."
SFBS, not a party to the lawsuit, moved to quash the subpoena or for a protective order on the grounds that Rasmussen had failed to show good cause or justifiable reason for the invasion of the private and confidential records of the blood service and its volunteer donors. The motion was denied and SFBS was ordered to produce the requested material.

AIDS
The 1980's have seen the emergence of a new and deadly disease, acquired immune deficiency syndrome or, as it is more commonly referred to, AIDS. The disease is characterized by an improperly functioning immune system which results in a lack of the normal body defense mechanisms and leaves the victim vulnerable to a wide variety of opportunistic diseases. Johnson, AIDS, 52 Medico-Legal Journal 3 (1984). At present, there is no known cause or cure and the mortality rate is high.[3]
Medical researchers have identified a number of groups which have a high incidence of the disease and are labeled "high risk" groups. The overwhelming percentage of AIDS victims are homosexual or bisexual males with multiple sexual partners (72%) and intravenous drug users (17%).[4]
The public has reacted to the disease with hysteria. Reported accounts indicate that victims of AIDS have been faced with social censure, embarrassment and discrimination in nearly every phase of their lives, including jobs, education and housing.[5] It is with the above facts in mind that we analyze the respective interests in this case.

*801 DISCOVERY
Florida Rule of Civil Procedure 1.280 allows for discovery of any matter, not privileged, that is relevant to the subject matter of the action. The scope of this rule, while recognized as being broad, Argonaut Insurance Co. v. Peralta, 358 So.2d 232 (Fla. 3d DCA), cert. denied, 364 So.2d 889 (Fla. 1978), is not without limitation. First, as the rule indicates, irrelevant and privileged matter is not subject to discovery. Fla.R.Civ.P. 1.280(b)(1). See also East Colonial Refuse Service, Inc. v. Velocci, 416 So.2d 1276 (Fla. 5th DCA 1982); Malt v. Simmons, 405 So.2d 1018 (Fla. 4th DCA 1981). Second, the discovery of relevant, non-privileged information may be limited or prohibited in order to prevent annoyance, embarrassment, oppression or undue burden of expense. Fla.R.Civ.P. 1.280(c); 1.410(b), (d)(1); Dade County Medical Association v. Hlis, 372 So.2d 117, 121 (Fla. 3d DCA 1979). We are dealing in this case only with this second limitation on discovery.
The discovery rules, enunciated pursuant to the supreme court's rule making authority under article V, section 2(a) of the Florida Constitution, grant courts authority to control discovery in all aspects in order to prevent harassment and undue invasion of privacy. Springer v. Greer, 341 So.2d 212, 214 (Fla. 4th DCA 1976), appeal dismissed, 351 So.2d 406 (Fla. 1977). If a person seeking to prevent discovery establishes good cause, then a court may make any order necessary to protect the interests set out in the rules. In deciding whether good cause has been shown it is necessary to balance the competing interests that would be served by the granting or denying of discovery. Hlis, 372 So.2d at 121. See also Lukaszewicz v. Ortho Pharmaceutical Corp., 90 F.R.D. 708 (E.D.Wis. 1981); Richards of Rockford, Inc. v. Pacific Gas & Electric Co., 71 F.R.D. 388 (N.D. Cal. 1976).

Rasmussen's Interest
Rasmussen claims a need for the disputed information in order to adequately prove aggravation of his injuries and allow for full recovery. In other words, damages can be recovered for Rasmussen's death if it can be shown that the AIDS which resulted in his death was caused by the blood transfusions which were necessitated by the injuries he suffered in the accident. While this is a legitimate interest, its weight is mitigated because there is no indication that the discovery of the donors' names and addresses will add significantly to the proof of causation.[6] First, none of the fifty-one donors has been identified as an AIDS victim.[7] Second, even if discovery revealed that some of the donors are in high risk groups, that would not establish that any one of them has AIDS, much less that they transmitted it through a transfusion. Since the probative value of the evidence which might be discovered is questionable, Rasmussen's interest in the information is slight when compared with the opposing interests which we now discuss.

The Privacy Interests of the Donors
SFBS and the Council of Community Blood Centers (CCBC), as amicus curiae, argue that the donors' privacy rights are constitutionally based. See, e.g., City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). See also, art. I, § 23, Fla. Const.[8] We *802 must decide whether a constitutionally protected privacy interest is at stake and, if so, whether that interest impacts on the discovery rules or court orders made pursuant to those rules.
There are two recognized zones of privacy. The first, the decision-making or autonomy zone of privacy interests, requires application of a compelling state interest test. That zone of privacy, however, is limited to decision-making interests in highly personal matters such as marriage, procreation, contraception, family relationships and education. Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); Roe v. Wade; Shevin v. Byron, Harless, Schaffer, Reid & Associates, 379 So.2d 633 (Fla. 1980). Such a privacy interest is not at issue in this case.
The second zone of privacy encompasses the interest in avoiding disclosure of personal matters. Whalen v. Roe, 429 U.S. 589, 598-600, 97 S.Ct. 869, 875-877, 51 L.Ed.2d 64 (1977); Plante v. Gonzalez, 575 F.2d 1119, 1127-28 (5th Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979); Florida Board of Bar Examiners Re: Applicant, 443 So.2d 71, 76 (Fla. 1983). This is essentially an interest in confidentiality. It is evident Rasmussen needs more than just the names and addresses of the donors. His interest is in establishing that one or more of the donors has AIDS or is in a high risk group. Because the groups at highest risk are homosexuals, bisexuals, intravenous drug users and hemophiliacs, it is obvious that Rasmussen would have to probe into the most intimate details of the donors' lives, including their sexual practices, drug use and medical histories. Both the courts and the legislature have recognized these areas as sanctuaries of privacy entitled to protection. See Priest v. Rotary, 98 F.R.D. 755 (N.D.Cal. 1983) (discovery of plaintiff's sexual history prohibited); Lampshire v. Procter & Gamble Co., 94 F.R.D. 58 (N.D.Ga. 1982) (identity of subjects of a Centers for Disease Control study entitled to protection where the study contained information about medical history, personal hygiene, menstrual flow, sexual activity, contraceptive methods, pregnancies, douching and tampon use); Argonaut Insurance Co. (medical records of strangers to the suit entitled to protection); Springer (identity of nonparty patients entitled to protection in discovery of pharmacist's records). See also §§ 397.053, .096, 455.241(2), Fla. Stat. (1983) (legislative recognition of the confidentiality of drug abuse treatment and medical patient records). Certainly these fifty-one donors did not anticipate, when they altruistically donated blood, that some future litigant would intrude into these most personal aspects of their lives. Such probing by strangers into these areas of one's life is itself an invasion of privacy entitled to consideration. Plante, 575 F.2d at 1135.
It is also necessary to take into account the ramifications of possible disclosure to persons outside the litigation. The articles cited in note 5 demonstrate that AIDS is the modern day equivalent of leprosy. AIDS, or a suspicion of AIDS, can lead to discrimination in employment, education, housing and even medical treatment. If the donors' names were disclosed outside the litigation, they would be subject to this discrimination and embarrassment, even though most, if not all of the donors, would not be AIDS victims in fact, but only innocent suspected victims. It cannot be doubted that the donors have a strong interest in remaining free from both the intrusion of litigants into their private lives and the oppressive effects of possible disclosure outside the litigation. This interest is protected by the state and federal constitutions and falls within the disclosural privacy zone we previously identified.[9]
*803 Having determined that the interests at stake are constitutionally based, we must analyze how these privacy rights relate to the discovery rules and orders issued pursuant to those rules. Court orders which compel, restrict or prohibit discovery constitute state action which is subject to constitutional limitations. Seattle Times Co. v. Rhinehart, ___ U.S. ___ 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (subjecting a protective order to first amendment scrutiny and affirming Rhinehart v. Seattle Times Co., 98 Wash.2d 226, 654 P.2d 673 (1982), which affirmed a protective order granted on the ground that the discovery sought would infringe on constitutionally protected rights of privacy, religion and association); Calderbank v. Cazares, 435 So.2d 377, 379 (Fla. 5th DCA 1983). Therefore, an order allowing or compelling discovery could impinge on the constitutionally protected right to disclosural privacy.
In analyzing this particular privacy interest courts have applied a balancing test, comparing the interests served by the state action with the interests encroached upon by that action. Nixon v. Administrator of General Services, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); Whalen v. Roe; Florida Board of Bar Examiners. In determining whether such an order is appropriate, the trial courts should balance the interests served by the rules of discovery against the interests of the party seeking protection. The discovery rules are designed to advance the state's interest in the fair and efficient resolution of disputes.[10] The more relevant and necessary the desired information is to a resolution of the case, the greater the state's interest in allowing discovery of the information. When possible, however, orders should be fashioned to minimize the impact on the competing interests. See, e.g., Rhinehart, 654 P.2d at 675, 690-91 (the discovery was allowed, thereby promoting the dispute resolution interest, but disclosure outside the litigation was prohibited in order to protect privacy interests).
This balancing test parallels the balancing test the courts have traditionally performed in good cause determinations under Rule 1.280(c). We find no infirmity in the fact that the rule places the burden of establishing good cause on the party seeking protection of a constitutional privacy right. The state's interest in fair and efficient resolution of disputes is great enough to justify a liberal discovery policy. The rule adequately accommodates privacy interests by providing for protection on a showing of good cause by the person whose privacy interest is at stake. Our decision today merely establishes that the state and federal constitutions are sources of privacy interests which must be scrutinized when raised in challenge of a discovery order.
Because we find that a balancing test, which is already utilized under Rule 1.280(c), is the appropriate standard to employ in deciding disclosural privacy claims, such a result will not unnecessarily or unreasonably impede the discovery process. Additionally, with regard to the state constitutional privacy provision, our interpretation is consistent with the language of section 23, which prohibits governmental intrusion into private lives and which was approved by the electors of this state.

The Institutional and Societal Interests
The institutional and public interests at stake are so inter-connected that they are discussed together. SFBS, along with twenty-six other regional blood centers, is a member of the Council of Community Blood Centers (CCBC). CCBC is a national association which, together with the American Red Cross and the American Association of Blood Banks, bears the responsibility for the nation's blood service system. One of the preeminent goals of *804 these associations is to ensure the safety and adequacy of the nation's blood supply. An important means of attaining that goal is the promotion of an all-voluntary blood donation system. Such a voluntary system is encouraged by both the federal and state governments, see National Blood Policy, 39 Fed.Reg. 32701 (Sept. 10, 1974); § 381.601(3)(c), (4), Fla. Stat. (1983), because the blood of volunteer donors is less likely to be contaminated with infectious diseases than that of paid donors. National Blood Policy, 39 Fed.Reg. at 32702. SFBS and CCBC claim that confidentiality of blood service records is essential if they are to maintain a voluntary blood donation system which can meet the demands of society for blood and blood products, which task they are already experiencing difficulty in accomplishing.[11]
It cannot be questioned that the interests of these organizations are the interests of society as well. An all-volunteer blood donation system should be encouraged in order to maintain the life and health of individual members of society and, thus, society as a whole. As a corollary, it is in the public interest to discourage any serious disincentive to voluntary blood donation such as an intrusive probe into the most intimate details of one's life.[12] The public interest can be a sufficient reason for prohibiting the discovery of particular information. Numerous courts have found the interest in the free flow of information, ideas and advice sufficient to overcome the interest in the discovery of the reports of investigating committees and researchers. See, e.g., Andrews v. Eli Lilly & Co., 97 F.R.D. 494 (N.D.Ill. 1983) (quashing in part a subpoena seeking the records of a research repository); Lampshire (protecting the identity of research subjects); Richards of Rockford, Inc. (motion to compel disclosure of research information denied); Hlis (prohibiting discovery of a medical review committee report), and cases cited therein, 372 So.2d at 120; Head v. Colloton, 331 N.W.2d 870, 876 (Iowa 1983) (prohibiting disclosure of the identity of a potential bone marrow donor on statutory grounds, but noting the "possible chilling effect of disclosure upon medical research"). We likewise find the free flow of donated blood of sufficient public importance, when combined with the privacy interests of the donors in this AIDS-related litigation, to outweigh Rasmussen's interest in discovering the names and addresses.
We conclude by emphasizing that we are not deciding that a blood bank's records are immune from discovery in all cases. We are merely holding that on the facts of this case, after balancing all of the interests involved, the requested material should not be discovered. The complete denial of discovery is necessary to ensure the protection of both the donors' privacy interests and society's interest in a strong and healthy volunteer blood donation program.
Since the order denying SFBS' motion for protection from discovery was a departure from the essential requirements of law from which there is no adequate remedy by appeal, certiorari is granted and the order is quashed.[13]
BARKDULL, J., concurs.
SCHWARTZ, Chief Judge (dissenting).
Judge Nesbitt's opinion is carefully considered and well-crafted, but I profoundly *805 disagree with both its general approach and its conclusion. While it is of course accurate to say that the present discovery controversy, like almost every other, is properly resolved by balancing the "competing interests to be served by granting discovery or by denying it," Dade County Medical Association v. Hlis, 372 So.2d 117, 121 (Fla. 3d DCA 1979); North Miami General Hospital v. Royal Palm Beach Colony, Inc., 397 So.2d 1033 (Fla. 3d DCA 1981), I think the court's opinion has put its thumb on the scale.

I
Treating first the plaintiff's interest in securing the information in question, it must be emphasized  although the court does not mention the fact  that the defendant below, apparently on the ground that Rasmussen may himself have been a member of a "high risk" group, severely contests the fact that he acquired AIDS in the blood transfusion process. Thus, far from a matter of purely tangential concern as in the cases cited supra, it is of absolute necessity to his and his survivors' right and ability to recover that they secure information that one or more of the donors is suffering from or is a potential carrier of the lethal affliction.[1]

II
On the other side of the balancing process, the court first places the so-called privacy interests of the individual blood donors. In doing so, it overlooks that the order before us requires only the revelation, within the litigation[2] of nothing more than the names and addresses of the donors  a subject as to which there is no statutory privilege, see Marshall v. Anderson, 459 So.2d 384 (Fla. 3d DCA 1984), no constitutional one of which I am aware, and no actual or practical one. Indeed, the donors have in fact already obviously revealed their identities to the blood bank  which, if it were concerned with the total anonymity of its donors, would not have even taken this information from them. Beyond this, I can think of no reason why the fifty-one persons would have any objection whatsoever to Rasmussen's relatives merely having their names  if they are not within one of the risk groups, a fact which would likely immediately become obvious to the plaintiff's lawyer without further inquiry or intrusion of any kind. If they are within such a group, or if they are otherwise presently or potentially AIDS carriers or victims, I should think both that they themselves would want to know about that and, more important, that their "right to privacy" must take second place to revealing and paying the price for the immense harm they may have done. None of the monstrous effects of the order below contemplated by the majority has actually occurred, and none may ever occur. If one should come to pass  that is, an unjustified or publicly revealed probe into the intimate details of the personal or sexual life of any donor, it will be time enough for the court to intervene. It is overkill of the worst kind, it seems to me, to cut the plaintiff off from any meaningful discovery to prevent a presently non-existent abuse of a dubious and non-asserted personal right.
The court's other ground for the decision to deny discovery  its perception that it *806 promotes "institutional and societal interests" of which it approves  is, in my judgment, based on a combination of a sense of judicial self-importance and self-aggrandizement at the expense of the legislature on the one hand, and the presentation of a parade, indeed, a carnival of horribles on the other. It is that discovery of the fifty-one names will interfere with, perhaps destroy, the free flow of donated blood in our society. I can accept none of the premises upon which this prong of the court's opinion is based.
First, I believe it highly unlikely that our holding that the relatives of a deceased AIDS victim who have made a strong showing that he acquired the disease from a transfusion may learn the identities of those who gave him blood would even become known to potential donors, let alone adversely affect their decision to do so. Moreover, even if we take upon ourselves the task of answering the threshold question of whether encouraging voluntary blood donations is a good idea as a matter of public policy, but see 10 Fla.Jur.2d Constitutional Law § 147 (1979),[3] I do not understand upon what information the court relies in concluding that the denial of discovery here will promote that end in any way. If I had to speculate about it  and the court's having done so makes it necessary to respond in kind  I would say that no one not in a risk group would be likely to have any hesitancy in giving blood no matter what we do in this case.[4] And, as I have already indicated, if those who are at risk are discouraged by the potential of the revelation of their names  when their blood causes AIDS  that is, I would have thought, a consummation devoutly to be wished.[5] With respect, I believe that the majority has no basis for disputing my analysis or to support its contrary prediction. As a matter of the inherent limitations of the institution, a court ought not, as has the majority, base a decision concerning the rights of those who come before it upon the supposed pragmatic consequences of that ruling when there is neither evidence in the record  nor means of acquiring it  as to what those results may be. All in all, Dean, later Judge, Goodrich might have been describing the majority opinion when he pointed out more than fifty years ago that
Judges have laid down rules on the basis of public policy without the slightest support for the policy except preconceived opinion, and without either knowing or having means of knowing whether the *807 policy declared was or was not aided by the particular decision rendered.
Goodrich, The Improvement of the Law, 4 Temp.L.Q. 311, 324-25 (1930).

III
However the "interests" advanced by the court may be characterized  and I believe they are chimerical and hypothetical at best  they fade into total insignificance in the face of the rights of a blood donee to be free of AIDS and those of his survivors to recovery under the law when that horrendous result has in fact occurred. Because of the notion, founded solely upon its own unsupported suppositions about human conduct, that to do so will promote a policy which it alone has devised, the majority has seen fit to deny the ordinary discovery processes clearly provided in the rules to one who has done nothing but acquire AIDS and die. While we surely have the power to take that course, I do not think we have the right. I think the petition should be denied.[6]
NOTES
[1] A petition for certiorari is an appropriate vehicle for challenging the correctness of an order denying protection from discovery. East Colonial Refuse Service, Inc. v. Velocci, 416 So.2d 1276 (Fla. 5th DCA 1982).
[2] Rasmussen died on June 11, 1984 and a suggestion of death was filed on June 12, 1984. To our knowledge, a personal representative has not yet been appointed. Consequently, Rasmussen's name is used throughout the opinion to describe the party seeking discovery.
[3] The mortality rate may be as high as forty per cent (40%). Blodgett, Despite the public's hands-off attitude towards AIDS, those who discriminate against the disease's victims are finding no immunity from the law, 12 Student Law. 8 (Jan. 1984).
[4] Other high risk groups are hemophiliacs (1%), heterosexual partners of AIDS victims (1%), and blood transfusion recipients (1%). Centers for Disease Control, United States Public Health Service, Morbidity and Mortality Weekly Report (June 22, 1984) at 1-2.
[5] See, e.g., Flaherty, A Legal Emergency Brewing Over AIDS, Nat'l, L.J. July 9, 1984, at 1, col. 3; Pagano, Quarantine Considered for AIDS Victims, 4 Cal.Law. 17 (March 1984); Blodgett, supra, n. 3; Reaves, AIDS and the Law, 69 ABAJ 1014 (Aug. 1983).
[6] It should be noted that Rasmussen already has the testimony of Dr. Kenneth Ratzen, Chief of the Division of Infectious Diseases at Mt. Sinai Medical Center, to the effect that "in all medical probability the cause of Mr. Rasmussen's AIDS was due to the multiple blood transfusions he received at St. Francis."
[7] SFBS made this determination by checking the donors' names against the Dade County Health Services' list of AIDS victims.
[8] 23. Right of privacy.  Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
[9] Rasmussen argues that allowing the discovery would discourage those with AIDS or those in high risk groups from donating blood. That is unquestionably true. There are two problems, however, with the contention. First, the effect of disclosure will extend beyond the desired end because persons without AIDS and not in high risk groups will also be discouraged from donating. Second, the discovery rules were not designed to achieve such goals, but to fairly and reasonably aid the litigation process. It is for other agencies of government to act in detecting and preventing the spread of infectious diseases. See, e.g., § 20.19(1)(g), Fla. Stat. (1983).
[10] The value we place on our dispute resolution system is evidenced by article I, section 21 of the Florida Constitution which guarantees that "[t]he courts shall be open to every person for redress of any injury, ..."
[11] SFBS argues that Florida Administrative Code Rules 10D-41.22, .34(5)(c) make the donors' names and addresses confidential. While we decline to hold that the rules make blood donors' names and addresses confidential for all purposes, we at least find support for the result we reach in the Department of Health and Rehabilitative Services' decision to make the reports of examinations of donors' blood specimens confidential. It is indicative of society's and the government's desire to prevent the unwarranted intrusion of privacy interests.
[12] The concern of the writer as to footnote 4 in Judge Schwartz' dissent is that it rests upon an assumption that a test has been devised which completely eliminates the possibility of a blood bank accepting a donation from anyone contaminated with AIDS. Until such an event occurs, the possibility of discouraging volunteer blood donors remains real and substantial. When such a test is developed, the time for revisiting this issue, if it is presented to the court, will have arrived.
[13] Because we find the issue presented to be of great public importance, we certify the following question to the Supreme Court of Florida, as provided for in article V, section 3(b)(4) of the Constitution of the State of Florida:

Do the privacy interests of volunteer blood donors and a blood service's and society's interest in maintaining a strong volunteer blood donation system outweigh a plaintiff's interest in discovering the names and addresses of the blood donors in the hope that further discovery will provide some evidence that he contracted AIDS from transfusions necessitated by injuries which are the subject of his suit?
[1] The fact that the petitioner has stated that none of the fifty-one is now suffering from AIDS is plainly insufficient. (In fact, without more, that representation unfairly weighs against Rasmussen's interests in proving his claim.) This is true both because the statement is a unilateral one which the plaintiff has no means of testing and because, we are told, one need not himself have developed the disease in order to transmit it.
[2] No public release even of the names is involved.
[3] Ironically, one of the things which might be said against this policy is today's decision; the maintenance of the secrecy of donors' identity, which the majority says is required to preserve the system, but which operates to the serious disadvantage of those who are damaged by the system, may be too great a price to pay.
[4] Indeed, if the reported development of a blood test which reveals the presence of the AIDS virus is accurate and the use of such blood is thereby precluded, no future donee will ever acquire AIDS and no future donor will therefore ever have reason to be discouraged from giving by the court-created fear of what might happen in discovery if, as perhaps occurred here, that does take place. Thus, the court's denial of established rights to Rasmussen may well be for absolutely nothing. In any case, the essential point is that the determination of whether it is is not for this or any other court to make.
[5] In answer, the court says at note 9:

Rasmussen argues that allowing the discovery would discourage those with AIDS or those in high risk groups from donating blood. That is unquestionably true. There are two problems, however, with the contention. First, the effect of disclosure will extend beyond the desired end because persons without AIDS and not in high risk groups will also be discouraged from donating. Second, the discovery rules were not designed to achieve such goals, but to fairly and reasonably aid the litigation process. It is for other agencies of government to act in detecting and preventing the spread of infectious diseases. See, e.g., § 20.19(1)(g), Fla. Stat. (1983).
Concerning the first response, the court does not know  and common sense indicates otherwise  that a non-high risk person will be discouraged from giving blood. The second response leaves me completely non-plussed. The majority seems not to recognize that the entire basis of its decision is not the forwarding of the litigation between Rasmussen and the tortfeasor, but, to the complete contrary, the vindication, by means the effect of which is dubious at best, of the voluntary system of blood donation. I entirely agree that this is not our business.
[6] While I agree that the issue in this case is of great public importance and should be certified as such to the supreme court, I would prefer that the question be less argumentatively phrased than the one framed at note 12 of the majority opinion. I would propose the following, non-leading question:

Whether a plaintiff who presents a colorable claim that he acquired AIDS through blood transfusions required by treatment of injuries sustained in an accident may discover the names and addresses of the blood donors in an action against the party allegedly liable for the accident?