**Jane DOE, Plaintiff,**

v.

**AMERICAN RED CROSS BLOOD SERVICES, S.C. REGION, Defendant.**

**John DOE, Plaintiff,**

v.

**AMERICAN RED CROSS BLOOD SERVICES, S.C. REGION, Defendant.**

Civ. A. Nos. 3:87–59–15, 3:87–60–15.

United States District Court,
D. South Carolina,
Columbia Division.

June 1, 1989.

Benjamin M. Mabry, Cromer & Mabry, Charles L. Henshaw, Jr., Law Offices of O. Fayrell Furr, Columbia, S.C., for plaintiffs.

Stephen G. Morrison, David E. Dukes, Nelson, Mullins, Riley & Scarborough, Columbia, S.C., Bruce M. Chadwick, Arnold & Porter, Washington, D.C., for defendant.

## ORDER

HAMILTON, District Judge.

In these companion cases the plaintiffs, Jane Doe and her husband John Doe, con-

tend that Jane Doe contracted the human immunodeficiency virus ("HIV"), which causes the deadly acquired immune deficiency syndrome ("AIDS"), from a unit of blood collected and processed by the defendant, American Red Cross Blood Services, S.C. Region ("Red Cross"). The matter is presently before the court on plaintiffs' motion to compel Red Cross to identify the HIV positive donor whose blood was transfused into Jane Doe during an operation on January 9, 1985. Rule 37(a) Fed.R.Civ. Proc. Plaintiffs have moved, in the alternative, for an Order compelling the Red Cross to subpoena the blood donor to a "veiled" deposition, at which the donor, whose identity would remain confidential, would be questioned by plaintiffs' counsel regarding Red Cross' alleged negligence in accepting his blood.

### Background Facts

In early January of 1985, Jane Doe entered the Lexington County Hospital in Lexington, South Carolina for spleen and gall bladder surgery. During her operation on January 9, 1985, she received a blood transfusion contaminated with the virus known to cause AIDS. Red Cross had collected the contaminated unit of blood from a volunteer donor in Columbia, South Carolina on January 4, 1985. Although Jane Doe has not yet developed AIDS, she has contracted HIV, she currently suffers from AIDS-related complex (or pre-AIDS), and, according to her treating physicians and other experts, she will most likely develop AIDS.

On December 8, 1986, Jane Doe instituted this negligence action against Lexington County Hospital and Red Cross in the Court of Common Pleas for Richland County, South Carolina. On the same day, her husband, John Doe, instituted an action for loss of consortium, and the two suits were consolidated. Defendants subsequently removed the cases by petition filed January 9, 1987. Plaintiffs have since dismissed the Lexington County Hospital and now only seek redress from Red Cross.

In their complaints plaintiffs contend that Red Cross was negligent in two respects: (1) in failing to employ, before January of 1985, a surrogate test to identify for exclusion blood donors who were at high risk for transmitting AIDS; and (2) in not permanently disqualifying the donor in question based upon the health history he gave while attempting to give blood on July 25, 1984. The court has granted Red Cross' motion for summary judgment on the "negligent testing issue." *See Doe v. American Red Cross Blood Services,* 125 F.R.D. 637 (D.S.C.1989). The only remaining substantive issue is whether the Red Cross was negligent for not permanently disqualifying the donor based upon the health history he gave during a visit to the Red Cross on July 25, 1984.

From Red Cross documents, which have been provided to the plaintiffs, the parties and the court have a great deal of information about what happened during the donor's July 25, 1984, visit to the Red Cross. The donor initially reported on that day to a mobile Red Cross site. At that time, he was given a pamphlet entitled "What You Should Know About Giving Blood," Defendant's Exh. A, Doc. Nos. 88–89 to Defendant's Motion for Summary Judgment ("Defendant's Exh. ___, Doc. No. ___"), and a donor health history questionnaire, Defendant's Exh. C, Doc. No. 227. The pamphlet, which the donor confirmed by his signature that he had read and understood, described the illnesses that could be spread by blood transfusions, including AIDS and hepatitis. Defendant's Exh. A, Doc. Nos. 88–89. The pamphlet also described the groups of individuals which, according to the Office of Biologics of the Food and Drug Administration ("FDA"), were at increased risk of developing AIDS. *Id.* With regard to hepatitis, the pamphlet stated that: "Persons with a past history of viral hepatitis are deferred permanently." *Id.* Finally, the pamphlet instructed the donor:

If you believe that you may be one of the above-mentioned persons, or if you are an individual in one of the groups at increased risk of AIDS, we ask that you refrain from donating blood at this time. You may leave now without providing an explanation. Or, if you prefer, you may proceed to be deferred confidentially,

without further questioning, by the health history interviewer. If you would like additional information, Red Cross nurses and physicians will be pleased to answer any questions you may have.

If you donate blood today and have additional questions and concerns about whether your blood should be used for transfusion, please call the blood center as soon as possible.

*Id.*

After reading "What You Should Know About Giving Blood," the donor then completed the health history questionnaire, which is a form that asks approximately twenty (20) questions concerning the donor's past and present medical history. He answered "no" to each of the questions that could have disqualified him as a donor. Defendant's Exh. C, Doc. No. 227. In accordance with Red Cross' screening procedures, health history nurse Mary MacKay reviewed the donor's health history with him. When Ms. MacKay came to Question 1.1, "Ever had yellow jaundice, liver disease, hepatitis, or a positive blood test for hepatitis," the donor, who had answered the question "no" on the form,[1] indicated that he had previously tested positive for the "Australian antibody." *Id.*

Because she was uncertain about the term "Australian antibody," Ms. MacKay required a donor evaluation and deferred the donor indefinitely pending the outcome of the evaluation.[2] Ms. MacKay initiated the donor evaluation by completing the top portion of an evaluation form, wherein she wrote: "Donor states he has pos[itive] Australian *antibody* test—donations given at commercial blood banks." Defendant's Exh. C, Doc. No. 228 (emphasis in original). She then submitted this form, along with the donor's completed health history questionnaire, to Sara White, the head of nurs-

ing for the South Carolina Region. *Id.* Ms. White then had at least one discussion with the donor, during which she obtained the following additional information, also reflected on the donor evaluation card: the donor had "no clinical symptoms *ever* " of hepatitis; he confirmed for Ms. White that he was antibody positive; and he informed her that he had been a "med tech [i.e. medical technician or technologist] in the past." *Id.* (emphasis in original). Either before, during, or after this conversation, Ms. White consulted with Dianne Earp, the head of technical services for the South Carolina Region, concerning the acceptability of this donor. *Id.* Based upon the information provided by the donor and her consultation with Dianne Earp, Ms. White determined that the donor was acceptable. *Id.* On July 27, 1984, Ms. White telephoned the donor and informed him that the Red Cross would accept his blood. *Id.* Thereafter, the donor made blood donations to the Red Cross on July 29, 1984, on January 4, 1985 (the donation that infected Jane Doe with HIV) and on May 15, 1985 (the donation that tested positive for HIV under the newly discovered test for that virus).

Australian antibody, a term generally out of use since the 1970s, means antibody to hepatitis-B surface antigen ("anti-HBs"). According to plaintiffs, someone who is anti-HBs positive has a "past history of viral hepatitis," as that term is used in 21 C.F.R. § 640.3(c), unless he tests positive for the antibody because of vaccination or immunization or because his test was false positive. 21 C.F.R. § 640.3(c) specifically requires blood banks to defer permanently those with a "past history of viral hepatitis." Plaintiffs argue, therefore, that Red Cross was negligent in not permanently

---

1. An error line was drawn through a negative answer to Question 1.1 and a check placed in the "yes" box. It is unclear, however, whether this change was written by the donor, by Ms. MacKay, or by head nurse Sara White when she conducted the subsequent donor evaluation. The change has been dated and initialed on the health history card, but neither the date nor the initials have been deciphered. *See* Deposition of Mary MacKay at 8–9.

2. This is reflected on the donor's health history card. The "remarks" column of that card bears the notation, "1.1 pos. Australian antibody. Donor evaluation requested." Defendant's Exh. C, Doc. No. 227. A capital "I," for indefinite, appears in the box labeled "deferred until." The box labeled "deferral code" is marked "1.1," referring to Question 1.1. Defendant's Exh. C, Doc. No. 227.

deferring the donor in question without confirming that he was anti-HBs positive because of vaccination or immunization or because his test was false positive. Plaintiffs further allege that it was a generally recognized and accepted practice among blood banks in July of 1984 to defer permanently anti-HBs positive donors.

Red Cross, on the other hand, contends that donors, such as the one in question, who test positive for anti-HBs, but negative for the surface antigen of hepatitis-B (HBsAg),[3] are safe donors as long as they have never had any clinical symptoms of viral hepatitis. According to Red Cross, "a past history of viral hepatitis," as that phrase is used in 21 C.F.R. 640.3(c), means a past *clinical* history of viral hepatitis. Since the donor informed Sara White that he had never had any clinical symptoms of viral hepatitis, Red Cross contends that his blood was acceptable under 21 C.F.R. 640.3(c). Lastly, Red Cross argues that its decision to accept the donor's blood was consistent with the generally recognized and accepted practices among blood banks in July of 1984.

The issue of whether the Red Cross should have permanently deferred the donor based upon his answer to Question 1.1 is one that will turn largely on expert testimony of what constitutes "a past history of viral hepatitis" within the meaning of 21 C.F.R. § 640.3(c) and evidence of how the blood banking community treated like donors in July of 1984. Plaintiffs believe that the evidence and expert testimony they have submitted creates a genuine issue of fact regarding whether Red Cross employees were negligent in failing to defer permanently the donor. *See* Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment; Transcript of March

10, 1989, Hearing at 12. They believe, however, that the donor's testimony about Red Cross' acts or omissions in screening his blood on July 25, 1984, could help them make a more solid case. *Id.* For this reason, they have moved for an Order compelling Red Cross to identify the donor. Plaintiffs have moved, in the alternative, for an Order compelling the Red Cross to subpoena the donor to a "veiled" deposition.

Red Cross strenuously resists any discovery of the donor on the ground that it would violate the donor's right to privacy embodied in both the United States and South Carolina Constitutions. Red Cross further contends that the donor's identity or testimony is not discoverable under the Federal Rules of Civil Procedure in that such discovery is privileged pursuant to state statutes and administrative regulations. Rule 26(b)(1), Fed.R.Civ.Proc. Lastly, Red Cross contends that plaintiffs' discovery request is unduly annoying, embarrassing, oppressive, and burdensome and thus should be denied under Rule 26(c) of the Federal Rules of Civil Procedure.[4]

■ In deciding whether to issue a Protective Order under Rule 26(c), the court must balance the competing interests. In that regard, Red Cross maintains that subjecting the blood donor to discovery would violate his right to privacy and work to destroy the assurance of confidentiality that underpins the continued survival of the nation's volunteer blood programs. Red Cross also maintains that plaintiffs have enough information with which to pursue their claims, and stand little, if anything, to gain from questioning the donor. When the competing interests are balanced, Red Cross argues, the donor's inter-

---

**3.** Since before 1980, all Red Cross blood has been tested for HBsAg. Pursuant to federal regulation, positive units are discarded and the donor is deferred permanently. *See* 21 C.F.R. § 610.41.

**4.** Plaintiffs sought the identity of the donor by way of interrogatory. Red Cross objected to the interrogatory on the grounds outlined above. Plaintiffs then moved for an Order compelling Red Cross to answer the interrogatory or, in the alternative, for a "veiled" deposition. Red Cross

stood on its objections to the interrogatory and did not make a formal motion for a Protective Order under Rule 26(c). Red Cross' objections and their briefs in opposition to plaintiffs' motion to compel, however, specifically rely on the language and principles contained in Rule 26(c) and cases that have construed that Rule. At the May 26, 1989, hearing on this matter, counsel for both parties agreed that Rule 26(c) was applicable to plaintiffs' motion to compel.

est in privacy and society's interest in maintaining the integrity of the nation's blood supply far outweigh plaintiffs' interest in questioning the donor in this case.

## Discussion

Plaintiffs' motion to compel raises the issue of whether, under the facts of this case, discovery may be taken from an as-yet unidentified blood donor whose blood donation infected another person with the virus that causes AIDS. The issue has been well-briefed by counsel and has been the subject of several hearings before this court. After reviewing the arguments of counsel and the sparse but emerging case law, the court, avoiding the constitutional question raised by Red Cross, determines that the donor's interest in privacy and society's interest in preserving the integrity of the nation's voluntary blood programs outweigh the plaintiffs' interest in deposing the donor in this case.

■ Red Cross first contends that permitting plaintiffs to discover the donor would violate his right to privacy embodied in the South Carolina and United States Constitutions.[5] Under the South Carolina Constitution, the donor has the right to be secure in his person, home, papers, and effects from "unreasonable invasions of privacy." S.C. Const. Art. 1, § 10. The United States Constitution likewise has been held to embody the right to privacy. *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Court indicated that the right to privacy encompassed "the individual interest in avoiding disclosure of personal matters." *Id.* at 599–600, 97 S.Ct. at 876–77; *see also Nixon v. Administrator of General Services*, 433 U.S. 425, 457, 97 S.Ct. 2777, 2797, 53 L.Ed.2d 867 (1977). But the donor's right to privacy under either Constitution is not absolute. In determining whether the donor's identification deserves constitutional protection, the court would have to weigh the donor's interest in privacy against the State's interests in allowing discovery.[6] *See Nixon*, 433 U.S. at 459, 97 S.Ct. at 2798. Because this court finds that the Federal Rules of Civil Procedure adequately protect the donor's privacy interests in this case, the court need not engage in a constitutional analysis. In so holding, the court is mindful of its duty to avoid addressing constitutional questions where possible. *See Rasmussen v. South Florida Blood Service*, 500 So.2d 533 (Fla.1987); *Krygier v. Airweld, Inc.*, 137 Misc.2d 306, 520 N.Y.S.2d 475 (1987); *Taylor v. West Pennsylvania Hospital*, 48 Pa.D. & C.3d 178 (Pa.Ct.C.P. Allegheny Cty.1987). (These courts refused to rule on the constitutional question raised here, but went on to deny discovery of HIV infected blood donors under a state rule of civil procedure equivalent to Rule 26(c) of the Federal Rules.)

The Federal Rules of Civil Procedure allow for discovery of any matter, not privileged, that is relevant to the subject matter of the action. Rule 26(b)(1), Fed.R.Civ. Proc. Although broad in their scope, the rules of discovery are not without limitation. As Rule 26(b)(1) indicates, irrelevant or privileged matters are not discoverable. Moreover, the rules limit the discovery of relevant, nonprivileged matters where there is good cause to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. Rule 26(c), Fed.R.Civ.Proc. In determining whether information sought should be protected under Rule 26(c), the court must balance the competing interests that would be served by granting or denying discovery. *See Keyes v. Lenoir Rhyne Col-*

---

5. The Red Cross, as custodian of the donor's health records, has standing to raise donor's constitutional right to privacy. *See Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir.1981); *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *In re The June 1979 Allegheny County Investigating*

*Grand Jury*, 490 Pa. 143, 415 A.2d 73, 76 (1980) (medical records).

6. Notably, a court Order which compels or restricts pretrial discovery constitutes state action that is subject to constitutional limitations. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

*lege,* 552 F.2d 579, 581 (4th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). *Belle Bonfils Memorial Blood Center v. District Court,* 763 P.2d 1003, 1010 (Colo.1988); *Rasmussen,* 500 So.2d at 535; *Krygier,* 137 Misc.2d at 307–09, 520 N.Y.S.2d at 476–77.

Red Cross argues that the donor's identity is "privileged" under several South Carolina statutes and administrative regulations. Section 44–29–90 of the South Carolina Code of Laws provides that: "When a person is identified, [by a state, district, county, or municipal health official] as being infected with human immunodeficiency virus (HIV), the virus which causes acquired immune deficiency syndrome (AIDS), his known sexual contacts or intravenous drug user contacts, or both, must be notified but the identity of the donor infected must not be revealed." S.C.Code Ann. § 44–29–90 (Law.Co-op.Supp.1988). Code section 44–29–80 requires that a laboratory that performs a positive test for a sexually transmittable disease report the case to the Department of Health and Environmental Control ("DHEC"), and code section 44–29–135 requires that DHEC and its agents keep all information and records relating to such cases "strictly confidential." S.C.Code Ann. §§ 44–29–80 and 44–29–135 (Law.Co-op.Supp.1988). Section 44–29–135 even prevents DHEC from disclosing such information under subpoena, except in certain circumstances. Finally, DHEC Regulation R61–21, § 10, promulgated pursuant to S.C.Code Ann. § 44–29–130 (Law.Co-op.Supp.1988), provides that: "All information and reports concerning persons infected with venereal diseases shall be inaccessible to the public except insofar as publicity may attend the performance of the duties imposed by these regulations and by the laws of the State." S.C.Code Regs. R61–21, § 10 (1982).

These laws evidence a clear intent on the part of South Carolina legislators and administrators to prevent DHEC and its agents from disclosing the identification of victims of sexually-transmitted diseases. These measures serve not only the victim's interest in privacy, but they also serve the State's important interest in encouraging victims to seek help voluntarily and to give honest responses to screening questions. But these laws, by their own terms, are directed at DHEC—not at the courts. Therefore, they do not, individually or collectively, render the identity of the donor absolutely "privileged" within the context of a negligence action against a blood bank.[7]

Unlike the absolute nature of a privilege, Rule 26(c) determinations fall within the sound discretion of the trial court. *Keyes,* 552 F.2d at 581. In assessing plaintiff's motion to compel in light of Rule 26(c), the court must balance the donor's interest in privacy and society's interest in maintaining the confidentiality of volunteer blood donors against the plaintiffs' interest in questioning the donor. *Id.* The court begins its analysis with an examination of the donor's interest in privacy.

Plaintiffs have indicated that if this court permitted them to take a "veiled" deposition of the donor, they would like to question him, among other things, about the intimate details of his health history and how he believes that he became infected with the virus that causes AIDS. *See* Plaintiffs' Proposed Questions to Blood Donor at Questions G1–G41 and H113. When this donor donated blood to the Red Cross, he certainly could not have anticipated that some future litigant would be permitted to question him about these personal aspects of his life. On the contrary, the Red Cross, like other blood banks, gave the donor writ-

---

**7.** Red Cross also points to a principle of ethics governing doctors, which provides that: "A physician may not reveal confidences entrusted to him in a course of medical attendance or the deficiencies he may observe in the character of patients, unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or of the community." S.C.Code Regs. 81–60I (1987). This provision protects a *physician* from having to reveal the *confidences* of a patient or any *deficiencies in character* he may observe while treating a patient. It does not protect a non-physician, such as a nurse, from having to reveal the identity of a patient. Therefore, it likewise does not stand as an absolute privilege against release of the donor's identity in this case.

ten assurance that his identity and medical history would remain confidential. *See* "What You Should Know About Giving Blood," Defendant's Exh. A, Doc. Nos. 88–89; note 8 *infra.* Avoiding the constitutional argument, the probing by strangers into personal areas of one's life is certainly an invasion of privacy entitled to serious consideration. *United States v. Westinghouse Electric Corporation,* 638 F.2d 570 (3d Cir.1980) (information about one's body and state of health is a matter of personal privacy). *Priest v. Rotary,* 98 F.R.D. 755 (N.D.Cal.1983) (discovery of plaintiff's sex history prohibited); *Lampshire v. Procter & Gamble Co.,* 94 F.R.D. 58 (N.D.Ga.1982) (court protected identity of subjects of study conducted by Center for Disease Control since study contained information about subject's medical history, personal hygiene, menstrual flow, sexual activity, contraceptive methods, pregnancies, douching, and tampon use). This is especially true where, as here, the donor is suffering from a disease that is widely thought of as the modern day equivalent of leprosy. *Rasmussen,* 500 So.2d 535–37; *Taylor,* 48 Pa.D. & C.3d at 187–88 (both cases addressed privacy interests of blood donors infected with HIV virus). Therefore, it cannot be doubted that this donor has a strong interest in avoiding the intrusion of litigants into his private life.

The court must also take into account the ramifications of possible disclosure of the donor's identification to persons outside this litigation. The public has reacted to AIDS with hysteria. Law review articles addressing this issue indicate that AIDS, or even the suspicion of AIDS, leads to discrimination in employment, education, housing, and even medical treatment. *See,*

*e.g.,* Flaherty, *A Legal Emergency Brewing Over AIDS,* Nat'l.L.J. 1. (1984); Pagano, *Quarantine Considered For AIDS Victims,* 4 Cal.Law. 17 (1984); Reeves, *Aids and the Law,* 69 A.B.A.J. 1014 (1983). In short, an inadvertent disclosure of the donor's identity could literally devastate his life. Although the few courts that have permitted discovery of AIDS infected blood donors have taken steps to protect their confidentiality, *see, e.g., Mason v. Regional Medical Center of Hopkins County,* 121 F.R.D. 300 (W.D.Ky.1988) (donor's identity only revealed to "a limited number of persons"); *Belle Bonfils,* 763 P.2d at 1013–14 (court protected donor's identity and ordered deposition of donor by written questions); *Tarrant County Hosp. Dist. v. Hughes,* 734 S.W.2d 675 (Tex.App.1987) (donors' identities only revealed to parties, and discovery from them proceeded by Order of court), these courts could offer the donors no guarantees.

Turning to society's interest, the goal of nonprofit blood banks such as the Red Cross is to ensure the safety and adequacy of the nation's blood supply. Because the blood of volunteer donors is less likely to be contaminated with infectious diseases than that of paid donors, National Blood Policy, 39 Fed.Reg. 32,701 (1974), the federal government has encouraged the promotion of an all volunteer blood donation system. *Id.* The testimony of blood banking experts in this and other cases indicates that the assurance of confidentiality is absolutely essential to maintain a volunteer blood donation system that can meet society's demands. *See* Affidavit of Todd A. Kolb, M.D., Exh. 1 to Defendant's Brief in Opposition to Plaintiff's Motion to Compel[8]; *South Florida Blood Service v. Ras-*

---

**8.** Dr. Kolb, Director of the Red Cross' Blood Center in Columbia, South Carolina, states that:
Based on my experience in donor recruitment activities, I am persuaded beyond doubt that release of donor names would lead donors and prospective donors to perceive a significant risk that they could be exposed to the inconvenience, disruption and/or embarrassment of depositions or interviews by litigants probing their sexual practices or other personal information.
It is my firm professional opinion, based on my experience, that a breach in the confiden-

tiality of donor records, such as the release of donor names, would result in a substantial decrease in the voluntary donation of blood. This would seriously jeopardize our ability to meet the current community needs in South Carolina for blood and blood components. Kolb Affidavit at paras. 9 and 10. Dr. Kolb's testimony is consistent with that of numerous blood banking experts who testified before a subcommittee of the United States House of Representatives on July 29, 1985, regarding the confidentiality of blood donors. *See* 99th

mussen, 467 So.2d 798, 804 (Fla.1985); Taylor, 48 Pa.D & C.3d at 186–90. Therefore, it is clearly "in the public interest to discourage any serious disincentive to voluntary blood donation." Rasmussen, 467 So.2d at 804. Courts have had no trouble recognizing that the prospect of inquiry into one's personal life, medical history, and potential association with infectious diseases such as AIDS is the kind of disincentive that could have a serious impact on the nation's supply of voluntary blood. See Rasmussen, 500 So.2d at 538, Rasmussen, 467 So.2d at 804; Taylor, 48 Pa.D. & C.3d at 188–90; see also Roche v. The American Red Cross, No. 87–3923 (Super.Ct. Mass. Apr. 26, 1989) (unpublished); Doe v. University of Cincinnati, d/b/a Paul I. Hoxworth Blood Center, 42 Ohio App.3d 227, 538 N.E.2d 419 (1988); Doe v. American Red Cross National Red Cross, No. 88c–169 (6th Cir.Ct.Davidson Cty.Tenn. Aug. 8, 1988) (unpublished); see generally Wyatt, Payne, Ingram & Quinley, AIDS: Legal and Ethical Concerns for the Clinical Laboratory, 4 J.Med.Tech. 108, 109 (1987) ("The decision as to whether the laboratory will be forced by the court to provide the names will have a profound impact upon voluntary donations.").

The erosion of confidentiality may not only affect the quantity of the blood supply, it could well affect its safety. This is because the safety of the blood supply depends largely on donors' willingness to provide accurate and detailed histories of private and sometimes sensitive medical information, and some donors may be reluctant to supply accurate information out of fear that personal aspects of their lives may be disclosed to persons not connected to the donation process. See Taylor, 48 Pa.D. & C.3d at 189–190.

Lastly, South Carolina's legislature, in passing such statutes as 44–29–80, 44–29–90, and 44–29–135, and DHEC, in adopting such regulations as R61–21, § 10, have taken the position that disclosure of those suffering from sexually transmitted diseases is against the public policy of this state and would be counterproductive in the fight against such diseases. These laws reflect the belief that the best strategy for limiting the spread of infectious diseases is to encourage the segments of the population most likely to be infected to come forward voluntarily for testing. "The guarantee of confidentiality is the cornerstone of this strategy because persons will not voluntarily come forward if positive test results may be disclosed to third persons." Taylor, 48 Pa.D & C.3d at 190. Court decisions that permit discovery of donors infected with the AIDS virus, even if they are narrowly drafted, will undermine this strategy to some degree.

In sum, assurances of confidentiality play a central role in maintaining a healthy and adequate blood supply. Permitting discovery of blood donors necessarily undermines the blood banks' assurances in that regard. If enough courts permit discovery of donors, blood banks, for purposes of ensuring that the consent of their donors is informed, will have to warn donors that they may be subject to questioning by litigants should their blood contaminate the recipient. Such a warning is likely to cause even the most civic-minded individual to think twice before voluntarily donating his blood to help another.

Cong., 1st Sess. No. 99–45, pp. 111–202 (1985). Witnesses at the hearing included Dr. Frankie Young, Commissioner of Food and Drugs of the Department of Health and Human Services; Dr. Edward N. Brandt, Jr., Former Assistant Secretary of Health; Dr. Joseph R. Bove, Professor of Laboratory Medicine at Yale University School of Medicine and Chairman of the Committee on Transfusion Transmitted Diseases of the American Association of Blood Banks; Victor Schmitt; Vice–President of Medical Operations of the American Red Cross; and Robert W. Reilly, President of the American Blood Servic-es Association. The witnesses uniformly testified that it has been the long-standing practices of those organizations involved in collecting and disseminating blood throughout the United States to maintain the confidentiality of information concerning blood donors, except the dissemination of information to other blood banks or health agencies which protect donor confidentiality. The witnesses further testified that it is essential that the established policy of protecting the identity of donors apply to donors who have been exposed to the AIDS virus. Id.

The interests outlined above must be balanced against the plaintiffs' important interest in discovering information relevant to their claims against Red Cross. The court is satisfied, however, that this interest has been adequately accommodated by the information already provided to them during discovery.

As mentioned earlier, the only substantive issue left in this case is whether Red Cross was negligent for not permanently disqualifying the donor based upon the health history he gave while attempting to give blood on July 25, 1984. Red Cross has provided plaintiffs with all of the documentation it possesses which is relevant to this issue. Plaintiffs, for instance, have the donor's health history questionnaires, his donor evaluation card, and a copy of the pamphlet "What You Should Know About Giving Blood," which donor acknowledged by his signature that he read and understood. In addition, Red Cross has identified the nurses who reviewed and evaluated the donor's health history.

After examining the documents provided to plaintiffs through discovery, plaintiffs own experts conceded that Red Cross' health history questionnaire and the pamphlet "What You Should Know About Giving Blood" satisfied the generally recognized and accepted standard of care for screening donors at the time in question.[9] Plaintiffs' experts do believe, however, that Red Cross employees were negligent in failing to exclude the donor based upon an answer he gave to *one* health history question on July 25, 1984. As mentioned earlier, the donor, who had answered "no" to Question 1.1, told Nurse MacKay during a follow-up interview that he had tested positive for the Australian antibody or anti-HBs. According to plaintiffs, anti-HBs positive donors have a past history of hepatitis and must be permanently deferred

pursuant to 21 C.F.R. § 640.3(c), unless it is determined that the donor tested positive because of vaccination or immunization or because his test was false positive. Plaintiffs argue, therefore, that Red Cross employees were negligent for accepting the donor's blood without confirming that he had tested positive because of vaccination or immunization or because his test was false positive. As mentioned earlier, however, the issue of whether the donor should have been deferred permanently based upon his answer to Question 1.1 is one that will turn largely on expert testimony of what constitutes a past history of viral hepatitis under 21 C.F.R. § 640.3(c) and evidence of how the blood banking community treated like donors in July of 1984. The court fails to appreciate how the donor's testimony can add anything meaningful to this charge of negligence.

Plaintiffs argue that they should be permitted to ask the donor whether he possibly meant Australian antigen when he said Australian antibody and whether the Red Cross made sure that he had not confused the two terms.[10] The court cannot agree. Even plaintiffs concede that blood banks are entitled to rely on the honesty and accuracy of responses by prospective donors unless it has reason to doubt a particular response. *See* Transcript of May 26, 1989, Hearing. In this case, the donor used the term Australian antibody not only with Nurse MacKay, but repeated it in a subsequent conversation with Nurse White. Moreover, the donor said he had worked as a medical technician in the past, which makes it likely that he, certainly more than the average person, appreciated the difference between a positive test for the Australian antibody and a positive test for the Australian antigen. After balancing what plaintiffs realistically stand to gain from questioning the donor against the counter-

9. See Deposition of Dr. Engleman, Defendant's Exh. E–4 at 154–55; Deposition of Dr. de Jongh, Defendant's Exh. E–1 at 169–70 and Defendant's Exh. E–2 at 12–16; Deposition of Dr. Fudenberg, Exh. E–7 at 43–44; Deposition of Dr. Conant, Exh. E–6 at 104–08. Notably, at the hearing on May 26, 1989, plaintiff's counsel recognized on the record that Red Cross' screening procedures in July 1984 were consistent with

the generally recognized and prevailing practices within the blood banking profession.

10. Notably, anyone who ever tests positive for the Australian antigen, or the surface antigen of hepatitis-B (HBsAg), must be deferred permanently under federal regulations. *See* 21 C.F.R. § 610.41.

vailing interests in favor of denying discovery, the court is constrained to deny plaintiffs' motion to discover the donor.

Significantly, in those few cases where courts permitted discovery of HIV infected donors, the plaintiffs' interest in questioning the donor was far greater than the plaintiffs' interest in questioning the donor in this case. In *Tarrant County Hospital District v. Hughes*, 734 S.W.2d 675 (Tex.Ct. App.1987) (4–3 decision), for instance, the defendant made no effort to determine whether any of its donors had been identified as AIDS virus carriers. This placed the plaintiff in the position of being unable to go forward with her suit absent discovery of the identity of the donors. In contrast, the Red Cross has already provided plaintiffs information concerning the HIV status of a potentially implicated donor, as well as all tests performed on his blood. The Red Cross has also provided plaintiffs all documentation in its possession concerning the donor's blood-donating history. Furthermore, the Red Cross has produced the employees who screened, tested, and evaluated the suitability of the donor. Therefore, the fact situation confronting this court is very distinguishable from the one faced by the court in *Tarrant*.

This court also notes that the conclusion in *Tarrant* was premised on the highly criticized proposition that disclosure of donors would benefit society by discouraging blood donation from those infected in AIDS. While the suggestion that disclosure of identities will serve to deter high-risk donors from donating is no doubt true, it will likely go much further and discourage numerous healthy individuals from donating their blood. *Rasmussen*, 467 So.2d at 802 n. 9. This is especially true with the spread of AIDS into the heterosexual community. As mentioned earlier, leaders of the blood banking community agree that disclosure of the names of individuals whose blood injures another will act as a serious deterrent to voluntary donations by even the most civic-minded of individuals. *See supra* note 8 and accompanying text.

The case of *Belle Bonfils Memorial Blood Center*, 763 P.2d 1003 (Colo.1988) (three judges dissenting) is also distinguishable. In this case, the plaintiff received six (6) units of blood during an operation, and it was later determined that one of the donors had tested positive for HIV. Of the thirty (30) questions on defendant's screening questionnaire, the infected donor answered "yes" to four questions which may have required him to be deferred either temporarily or permanently, depending on his answers to follow-up questions by defendant's employee. Because the technician's handwritten notes regarding donor's responses did not reveal whether the technician had followed defendant's own guidelines in screening the unmasked donor, the court held that the "unmasked" cards provided to plaintiff by defendant were insufficient to meet the minimum requirements of discovery under Colorado's counterpart to Rule 26(b).

*Belle Bonfils* is distinguishable from the instant case because the donor here answered "yes" to only one potentially disqualifying question (i.e. Question 1.1). The donor's health history questionnaire and evaluation form indicate that his answer to Question 1.1 was changed from "no" to "yes" after he indicated that he had tested positive for the Australian antibody. The handwritten notes of the Red Cross nurses indicate that they confirmed he was antibody positive, that he had never had any clinical symptoms of viral hepatitis, and that he had been a medical technician in the past. This factual background raises the issue of whether Red Cross employees were negligent in not permanently deferring the donor without first confirming that he had tested positive because of vaccination, immunization, or because his test was false positive. As discussed above, it is highly unlikely that the donor's testimony will be helpful in resolving this issue. Therefore, here, unlike in *Belle Bonfils*, plaintiffs can prosecute their case against the defendant without questioning the donor. More than that, plaintiffs here, unlike the plaintiff in *Belle Bonfils*, stand little, if anything, to gain in questioning the donor.

In sum, Red Cross' health history questionnaire, by admission of plaintiffs' own experts, met the prevailing standard of

care and the donor answered all but one of the potentially disqualifying questions in the negative. From notes on the donor's health history questionnaire and donor evaluation card, the parties and the court have a very reliable idea why he answered "no" to Question 1.1, and his further testimony on that question will most likely add nothing to plaintiffs' charge of negligence. Red Cross' pamphlet "What You Should Know About Giving Blood," which the donor indicated by his signature that he read and understood, likewise met the prevailing standard of care for self-exclusion policies. In light of this, the court believes that exposing the donor to questioning will have only marginal utility in advancing plaintiffs' case against Red Cross. Therefore, the court finds that the plaintiffs' interest in discovering the donor is far outweighed by the donor's interest in privacy and society's interest in maintaining the integrity of the nation's volunteer blood programs. The court recognizes that refusing to permit discovery of the donor will preclude plaintiffs from bringing an action against him. But plaintiffs' counsel have indicated on more than one occasion that they do not wish to depose the donor in order to develop a case against him. *See, e.g.,* Transcript of March 10, 1989, Hearing at 25–26.

The court finds support for its decision today in several recent cases that relied on a state rule of civil procedure equivalent to Federal Rule 26(c) in denying motions to compel the discovery of blood donors. For example, in *Rasmussen v. South Florida Blood Service, Inc.,* 500 So.2d 533 (Fla. 1987), plaintiff received fifty-one (51) units of blood during an operation. Some fourteen months later he was diagnosed as having AIDS. In an attempt to prove that he contracted AIDS during the operation, plaintiff sought to discover the names and addresses of the fifty-one (51) donors. The Florida Court of Appeals denied the request on the ground that disclosure of the donors would violate their rights under the United States and Florida Constitutions. *South Florida Blood Service, Inc. v. Rasmussen,* 467 So.2d 798 (1985). The Florida Supreme Court affirmed, but avoided the constitutional question. Under Florida's counterpart to Rule 26(c), the Florida Supreme Court balanced the competing interests and concluded that the dubious value of the discovery sought was far outweighed by the potentially significant harm to the privacy interests of unsuspecting donors and to society's interest in maintaining an adequate supply of volunteer blood.

In *Taylor v. West Pennsylvania Hospital,* 48 Pa.D & C.3d 178 (Pa.Ct.C.P.Allegheny Cty.1987) (unpublished), the plaintiff received blood in the course of open heart surgery. After plaintiff contracted AIDS, it was determined that a donor whose blood had been used during the operation tested positive for the AIDS virus. Plaintiff sought the donor's identification, which the blood bank withheld. In denying discovery of the donor's identity, the court examined the claimed right of constitutional privacy for blood donors. Although the court recognized a constitutional right to privacy against disclosure of personal matters, it refused to dispose of the issue on constitutional grounds. Instead, the court applied Pennsylvania's counterpart to Rule 26(c), and found that disclosure of the blood donor's identification would inhibit the donation of blood generally and that the interests of the plaintiff in discovery would have to bow to the needs of society.

In *Krygier v. Airweld, Inc.,* 137 Misc.2d 306, 520 N.Y.S.2d 475 (1987), the plaintiff's decedent received twenty-one (21) units of blood during treatment for severe burns. Thereafter, decedent contracted AIDS and died. His wife brought a wrongful death action, in which she sought the names and addresses of the blood donors whose blood was transfused into her husband. The court denied the request without reaching the blood bank's argument that disclosure would violate the donor's constitutional right to privacy. The court held that New York's patient-physician privilege, whose language is distinguishable from that contained in South Carolina's R81–60I, prevented disclosure of the donor's identity. The court went on to hold that, even if the patient-physician privilege was inapplicable, New York's counterpart to Rule 26(c) protected the anonymity of the donors under

the facts of that case. According to the court:

> The blood bank's interest in maintaining the anonymity of their donors together with society's interest in maintaining the free flow of volunteer blood far outweigh the plaintiff's right to the disclosure of all evidence material and necessary to the prosecution of her suit.
>
> . . . .
>
> Exposing donors to public scrutiny in order to determine what they may have told NYBC [New York Blood Center] has only marginal utility in advancing the plaintiff's theory of liability.

*Id.* 520 N.Y.S.2d at 477.

### Conclusion

Unfortunately, there are cases in which society's interest must take precedence over the interests that a few individuals may have in pursuing pretrial discovery in order to prosecute their claims for compensatory damages. This is such a case. Under the facts outlined above, society's interest in maintaining an adequate and safe supply of volunteer blood, coupled with the donor's interest in privacy, far outweighs plaintiffs' interest in questioning the donor. Therefore, IT IS ORDERED that plaintiffs' motion to compel Red Cross to identify the donor or, in the alternative, for a veiled deposition is denied.

IT IS SO ORDERED.