500 So.2d 533 (1987)
Donald RASMUSSEN, Petitioner,
v.
SOUTH FLORIDA BLOOD SERVICE, INC., Respondent.
No. 67081.
Supreme Court of Florida.
January 5, 1987.
George C. Bender of Bender, Bender and Chandler, Coral Gables, for petitioner.
James E. Tribble and Diane H. Tutt of Blackwell, Walker, Fascell and Hoehl, Miami, for respondent.
*534 Richard J. Ovelmen, General Counsel, Miami, and Edward Soto of the Law Offices of Edward Soto, P.A., Miami, for The Miami Herald Pub. Co., amicus curiae.
David E. Willett of Hassard, Bonnington, Rogers and Huber, San Francisco, Cal., for American Ass'n of Blood Banks, amicus curiae.
Michael H. Cardozo, Washington, D.C., for American Blood Com'n, amicus curiae.
B.J. Anderson and Kirk Johnson, Chicago, Ill., for American Medical Ass'n, amicus curiae.
Karen Shoos Lipton, Asst. General Counsel, Washington, D.C., for American Nat. Red Cross.
H. Robert Halper and Christina W. Fleps of O'Connor and Hannan, Washington, D.C., for Council of Community Blood Centers, amicus curiae.
Roger G. Welcher of the Law Offices of Roger G. Welcher, and Betsy E. Gallagher and Gail L. Kniskern of Talburt, Kubicki, Bradley and Draper, Miami, for Dade County Medical Ass'n, amicus curiae.
Thomas J. Guilday and Ralph A. DeMeo of Akerman, Senterfitt and Eidson, Tallahassee, for Florida Ass'n of Blood Banks, amicus curiae.
John Thrasher, Jacksonville, for Florida Medical Ass'n, amicus curiae.
Abby R. Rubenfeld, Managing Atty., Abraham L. Clott and Kevin Kopelson, Cooperating Attys., New York City, for Lambda Legal Defense and Educ. Fund, Inc., amicus curiae.
BARKETT, Justice.
We have for review South Florida Blood Service, Inc. v. Rasmussen, 467 So.2d 798 (Fla. 3d DCA 1985). In that decision, the district court certified the following as a question of great public importance:
Do the privacy interests of volunteer blood donors and a blood service's and society's interest in maintaining a strong volunteer blood donation system outweigh a plaintiff's interest in discovering the names and addresses of the blood donors in the hope that further discovery will provide some evidence that he contracted AIDS from transfusions necessitated by injuries which are the subject of his suit?
Id. at 805 n. 13. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We answer the question in the affirmative.
On May 24, 1982, petitioner, Donald Rasmussen, was sitting on a park bench when he was struck by an automobile. He sued the driver and alleged owner of the automobile for personal injuries he sustained in the accident. While hospitalized as a result of his injuries, Rasmussen received fifty-one units of blood via transfusion. In July of 1983, he was diagnosed as having "Acquired Immune Deficiency Syndrome" (AIDS) and died of that disease one year later.[1] In an attempt to prove that the source of his AIDS was the necessary medical treatment he received because of injuries sustained in the accident, Rasmussen served respondent, South Florida Blood Service (Blood Service), with a subpoena duces tecum requesting "any and all records, documents and other material indicating the names and addresses of the [51] blood donors." (South Florida Blood Service is not a party to the underlying personal injury litigation, and there has been no allegation of negligence on the part of the Blood Service.)
The Blood Service moved the trial court to either quash the subpoena or issue a protective order barring disclosure. That court denied the motion and ordered the Blood Service to disclose the subpoenaed information. On certiorari review, the Third District Court of Appeal, applying the balancing test that courts have traditionally performed under the Florida discovery rules, concluded that the requested material should not be discovered. Although we agree with respondent's contention that Rasmussen's blood donors' rights of privacy are protected by state and federal *535 constitutions, we need not engage in the stricter scrutiny mandated by constitutional analysis. We find that the interests involved here are adequately protected under our discovery rules and approve the decision of the district court. This opinion in no way changes or dilutes the compelling state interest standard appropriate to a review of state action that infringes privacy rights under article I, section 23 of the Florida Constitution as established in Winfield v. Division of Pari-Mutuel Wagering, Department of Regulation, 477 So.2d 544, 547 (Fla. 1985).
The potential for invasion of privacy is inherent in the litigation process. Under the Florida discovery rules, any nonprivileged matter that is relevant to the subject matter of the action is discoverable. Fla.R. Civ.P. 1.280(b)(1). The discovery rules also confer broad discretion on the trial court to limit or prohibit discovery in order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fla.R.Civ.P. 1.280(c). Under this authority, a court may act to protect the privacy of the affected person. Springer v. Greer, 341 So.2d 212, 214 (Fla. 4th DCA 1976), appeal dismissed, 351 So.2d 406 (Fla. 1977).
In deciding whether a protective order is appropriate in a particular case, the court must balance the competing interests that would be served by granting discovery or by denying it. North Miami General Hospital v. Royal Palm Beach Colony, Inc., 397 So.2d 1033, 1035 (Fla. 3d DCA 1981); Dade County Medical Association v. Hlis, 372 So.2d 117, 121 (Fla. 3d DCA 1979). Thus, the discovery rules provide a framework for judicial analysis of challenges to discovery on the basis that the discovery will result in undue invasion of privacy. This framework allows for broad discovery in order to advance the state's important interest in the fair and efficient resolution of disputes while at the same time providing protective measures to minimize the impact of discovery on competing privacy interests.
Accordingly, we must assess all of the interests that would be served by the granting or denying of discovery  the importance of each and the extent to which the action serves each interest. In undertaking this analysis, we begin by examining the nature and importance of the donors' rights.
The Supreme Court first recognized a right of privacy based on the United States Constitution in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). This right of privacy has been described as "the most comprehensive of rights and the right most valued by civilized man." Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969) (citing Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572-73, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)). In recent cases, the Court has discussed the privacy right as one of those fundamental rights that are "`implicit in the concept of ordered liberty' such that `neither liberty nor justice would exist if [they] were sacrificed.'" Bowers v. Hardwick, ___ U.S. ___, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986) (quoting Palko v. Connecticut, 302 U.S. 319, 325-26, 58 S.Ct. 149, (1937)). See Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). In Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876-77, 51 L.Ed.2d 64 (1977), the Supreme Court specifically recognized that the right to privacy encompasses at least two different kinds of interests, "the individual interest in avoiding disclosure of personal matters, and ... the interest in independence in making certain kinds of important decisions."[2] In Nixon v. Administrator of General Services, 433 U.S. 425, 457-458, 97 S.Ct. 2777, 2797-98, 53 L.Ed.2d 867 (1977), the Supreme Court reaffirmed the confidentiality strand of privacy. *536 Lower federal courts have recognized that the essential core of this zone of privacy is the right "to prevent disclosure of ... identity in a damaging context." E.g., Lora v. Board of Education of City of New York, 74 F.R.D. 565, 580 (1977). These cases clearly establish that the federal right to privacy extends protection in some circumstances against disclosure of personal matters.
Moreover, in Florida, a citizen's right to privacy is independently protected by our state constitution. In 1980, the voters of Florida amended our state constitution to include an express right of privacy. Art. V, § 23, Fla. Const.[3] In approving the amendment, Florida became the fourth state to adopt a strong, freestanding right of privacy as a separate section of its state constitution,[4] thus providing an explicit textual foundation for those privacy interests inherent in the concept of liberty which may not otherwise be protected by specific constitutional provisions.[5]
Although the general concept of privacy encompasses an enormously broad and diverse field of personal action and belief,[6] there can be no doubt that the Florida amendment was intended to protect the right to determine whether or not sensitive information about oneself will be disclosed to others. The proceedings of the Constitution Revision Commission reveal that the right to informational privacy was a major concern of the amendment's drafters. At the opening session of Florida's 1977-78 Constitution Revision Commission, then Chief Justice Ben F. Overton remarked:
[W]ho, ten years ago, really understood that personal and financial data on a substantial part of our population could be collected by government or business and held for easy distribution by computer operated information systems? There is a public concern about how personal information concerning an individual citizen is used, whether it be collected by government or by business. The subject of individual privacy and privacy law is in a developing stage... . It is a new problem that should probably be addressed. (Emphasis added.)
Address by Chief Justice Ben F. Overton to the Constitution Revision Commission (July 6, 1977). Thus, a principal aim of the constitutional provision is to afford individuals some protection against the increasing collection, retention, and use of information relating to all facets of an individual's life.
It is now known that AIDS is a major health problem with calamitous potential. At present, there is no known cure and the mortality rate is high.[7] As noted by the court below, medical researchers have identified a number of groups which have a high incidence of the disease and are labeled "high risk" groups. Rasmussen, 467 So.2d at 800. Seventy-two percent of all AIDS victims are homosexual or bisexual males with multiple sex partners and seventeen percent are intravenous drug users. Id. Other high risk groups are hemophiliacs (1 percent), heterosexual partners of *537 AIDS victims (1 percent), and blood transfusion recipients (1 percent). Id. at n. 4.
As the district court recognized, petitioner needs more than just the names and addresses of the donors. His interest is in establishing that one or more of the donors has AIDS or is in a high risk group. Petitioner argues that his inquiry may never go beyond comparing the donors' names against a list of known AIDS victims,[8] or against other public records (e.g., conviction records in order to determine whether any of the donors is a known drug user). He contends that because a limited inquiry may reveal the information he seeks, with no invasion of privacy, the donors' privacy rights are not yet at issue. We find this argument disingenuous. As we have already noted, the discovery rules allow a trial judge upon good cause shown to set conditions under which discovery will be given. Fla.R.Civ.P. 1.280(c). Some method could be formulated to verify the Blood Service's report that none of the donors is a known AIDS victim while preserving the confidentiality of the donors' identities. However, the subpoena in question gives petitioner access to the names and addresses of the blood donors with no restrictions on their use. There is nothing to prohibit petitioner from conducting an investigation without the knowledge of the persons in question. We cannot ignore, therefore, the consequences of disclosure to nonparties, including the possibility that a donor's co-workers, friends, employers, and others may be queried as to the donor's sexual preferences, drug use, or general life-style.
The threat posed by the disclosure of the donors' identities goes far beyond the immediate discomfort occasioned by third party probing into sensitive areas of the donors' lives. Disclosure of donor identities in any context involving AIDS could be extremely disruptive and even devastating to the individual donor. If the requested information is released, and petitioner queries the donors' friends and fellow employees, it will be functionally impossible to prevent occasional references to AIDS. As the district court recognized:
AIDS is the modern day equivalent of leprosy. AIDS, or a suspicion of AIDS, can lead to discrimination in employment, education, housing and even medical treatment.
Rasmussen, 467 So.2d at 802. We wish to emphasize that although the importance of protecting the privacy of donor information does not depend on the special stigma associated with AIDS, public response[9] to the disease does make this a more critical matter. By the very nature of this case, disclosure of donor identities is "disclosure in a damaging context." See Lora, 74 F.R.D. at 580. We conclude, therefore, that the disclosure sought here implicates constitutionally protected privacy interests.
Our analysis of the interests to be served by denying discovery does not end with the effects of disclosure on the private lives of the fifty-one donors implicated in this case. Society has a vital interest in maintaining a strong volunteer blood supply, a task that has become more difficult with the emergence of AIDS. The donor population has been reduced by the necessary exclusion of potential blood donors through AIDS screening and testing procedures[10] as well *538 as by the unnecessary reduction in the donor population as a result of the widespread fear that donation itself can transmit the disease.[11] In light of this, it is clearly "in the public interest to discourage any serious disincentive to volunteer blood donation." Rasmussen, 467 So.2d at 804. Because there is little doubt that the prospect of inquiry into one's private life and potential association with AIDS will deter blood donation, we conclude that society's interest in a strong and healthy blood supply will be furthered by the denial of discovery in this case.
In balancing the competing interests involved, we do not ignore Rasmussen's interest in obtaining the requested information in order to prove aggregation of his injuries and obtain full recovery. We recognize that petitioner's interest parallels the state's interest in ensuring full compensation for victims of negligence. However, we find that the discovery order requested here would do little to advance that interest. The probative value of the discovery sought by Rasmussen is dubious at best. The potential of significant harm to most, if not all, of the fifty-one unsuspecting[12] donors in permitting such a fishing expedition is great and far outweighs the plaintiff's need under these circumstances.
Accordingly, we approve the decision of the Third District.
It is so ordered.
McDONALD, C.J., and ADKINS, OVERTON, EHRLICH and SHAW, JJ., concur.
BOYD, J., concurs in result only.
NOTES
[1] His estate is proceeding with this action.
[2] One commentator has incorporated these related interests into a unitary concept by defining privacy as autonomy or control over the intimate aspects of identity. Gerety, Redefining Privacy, 12 Harv.C.R.  C.L.L.Rev. 233, 236 (1977).
[3] Article I, Section 23, Florida Constitution, provides:

Right of Privacy.  Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
[4] The other three are Alaska, California, and Montana. Six other states  Arizona, Hawaii, Illinois, Louisiana, South Carolina, and Washington  protect privacy to a lesser degree. See Note, Toward a Right of Privacy as a Matter of State Constitutional Law, 5 Fla.St.U.L.Rev. 631, 636-37 (1977).
[5] For example, intrusions into privacy during criminal investigations are generally protected by the prohibition against unreasonable search and seizure. See art. I, § 12, Fla. Const.
[6] See, e.g., Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (privacy of one's personal library); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (privacy of marital relationship).
[7] The mortality rate may be as high as 40 percent. Blodgett, Despite the public's hands-off attitude towards AIDS, those who discriminate against the disease's victims are finding immunity from the law, 12 Student Law 8 (Jan. 1984).
[8] South Florida Blood Service has stated that none of Rasmussen's fifty-one donors appears in lists of identified AIDS victims. We agree with petitioner, however, that he should not have to rely on the Blood Service's statement.
[9] Social hostility to the disease has been extended to individuals associated with the disease, however tangentially, even though they do not in fact have AIDS. See, e.g., N.Y. City Commission on Human Rights, Gay and Lesbian Discrimination Documentation Project (1984).
[10] On March 2, 1985, a serologic test which detects the presence of AIDS antibodies (the "HTLV-III antibody test") was licensed by the FDC, and is now being implemented in blood centers across the nation. Testing data indicates that, for a blood center collecting 100,000 units of blood annually, use of the HTLV-III test could result in discarding 610 units of blood annually and deferring 220 donors. Council of Community of Blood Centers Newsletter (March 4, 1985) at 3.
[11] This fear prompted the Surgeon General to distribute the following to newspapers across the nation: "There is no way that a donor can contract AIDS or any other disease by giving a pint of blood. Despite the known safety of donating blood, some people are afraid to give. In fact, blood donations are down from a year ago, and there is evidence that some previous donors are staying away from blood drives because they are afraid they will get AIDS." Public Health Service, Department of Health and Human Services, Donate Blood Regularly (December 1984).
[12] Without fully addressing the issue as it is unnecessary to our decision, we note that because disclosure of the information requested threatens damage to the donors' reputation and other liberty interests, the donors' due process rights are also implicated. See Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 646-47, 95 L.Ed. 817 (1951) (Frankfurther, J., concurring) ("the right to be heard before being condemned to suffer grievous loss of any kind ... is a principle basic to our society"); Utz v. Cullinane, 520 F.2d 467, 480 (D.C. Cir.1975) ("Due process obligates the government to accord an individual the opportunity to disprove potentially damaging allegations before it disseminates information that might be used to his detriment.").