Cynthia E. WATSON, Plaintiff–Appellee,

v.

**LOWCOUNTRY RED CROSS,**
Defendant–Appellant,

and

**Medical University of South Carolina, Defendant.**

No. 91–2053.

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1991.

Decided Aug. 28, 1992.

As Amended Nov. 2, 1992.

Fern Phillips O'Brian, Arnold & Porter, Washington, D.C., argued (Bruce M. Chadwick, Barry L. Johnson, Kathleen A. Behan, Arnold & Porter, Washington, D.C., Stephen G. Morrison, Stuart M. Andrews, Jr., Nelson, Mullins, Riley & Scarborough, Columbia, S.C., Edward L. Wolf, Associate General Counsel, American Red Cross, Washington, D.C., on brief), for defendant-appellant.

Bernard McIntyre, Moss, Dore, Kuhn & McIntyre, P.A., Beaufort, S.C., argued, for plaintiff-appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

## OPINION

K.K. HALL, Circuit Judge:

The American National Red Cross Blood Services, Carolina Lowcountry Region ("Red Cross") brings this interlocutory appeal pursuant to 28 U.S.C. § 1292(b) to complain about the district court's order granting plaintiff Cynthia Watson's motion to compel certain discovery concerning a blood donor. We affirm.

### I.

On February 10, 1985, Cynthia Watson gave birth to premature twins in Charleston, South Carolina. Trevor, one of the babies, received a number of blood transfusions through April, 1985. In 1986, he tested positive for HIV, and he later developed AIDS. He died in 1988.

Cynthia Watson was appointed administratrix of Trevor's estate. In December, 1988, she filed this wrongful death action against the Red Cross and the hospital at which Trevor received the blood transfusions following his birth.[1] The hospital

---

**1.** The action was initially filed in state court in South Carolina. It was removed to federal court by the Red Cross. On January 13, 1992, after argument was heard on this appeal, this case was placed in abeyance pending the Supreme Court's resolution of the issue of the

used blood supplied by the Red Cross, and the Red Cross was able to determine that only one of the six donors whose blood was used in these transfusions might have been HIV-positive when the blood was donated. Watson sought to discover from this unidentified "implicated donor" information about his background and about the donation process itself. One theory of liability is that the screening process to which the implicated donor was subjected was inadequately and negligently carried out by the Red Cross employees at the donor station.

Extensive discovery has already taken place in this case. Both of the nurses on duty at the donation center on the day in question have been deposed.[2] Not surprisingly, neither was able to remember the implicated donor, whom they screened some five years earlier. The Red Cross has also provided Watson with many non-identifying pieces of information about the donor, including a redacted copy of the screening questionnaire completed by him on February 27, 1985. Watson persisted, however, in her request for the identity of the donor or, alternatively, for the opportunity to question him through a court-appointed intermediary. The Red Cross moved for a protective order, and the matter was referred to the magistrate judge.

■ The magistrate recognized that some discovery from the donor is crucial to Watson's case against Red Cross, at least insofar as the claims of negligence rest on how this particular donor was screened on the day in question. The magistrate dismissed as factually unfounded the Red Cross's claims that the invasion of the donor's privacy would seriously jeopardize the nation's blood supply. It was recommended that the donor's identity be divulged to the court and that a lawyer be appointed to represent the donor's interests. The lawyer's name would also remain confidential, known only to the court. Watson would be permitted to file proposed interrogatories[3] to which the Red Cross could object. The approved questions would then be given to the donor's lawyer to forward to his client, and the answers (with the donor's verification redacted) would then be delivered to the parties.

The Red Cross filed objections to the report, and argument was held before the district court. The district court accepted the recommendations, and in February, 1991, a set of interrogatories was approved. Essentially, these interrogatories delve into the donor's blood-donation history, with particular emphasis on the February 27 donation. Some of the interrogatories inquire into some limited aspects of the donor's personal history. The district court granted the Red Cross's motion for a stay and certification for permission to take an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). A panel of this court granted leave to file the appeal.

## II.

The issues before us are well-defined, and the arguments for each side have been honed before a score of courts and analyzed in numerous law review articles. Yet the courts have been unable to reach a consensus on any of the major issues involved in such actions. As formulated by the district court, the precise "controlling question of law" certified for our review is "whether direct discovery from an anonymous volunteer blood donor should be prohibited under Federal Rules of Civil Procedure 26(c), and/or the Constitutions of the

---

federal court's original jurisdiction over cases to which the Red Cross is a party. The Court has recently held that the Red Cross charter confers such jurisdiction. *American National Red Cross v. S.G.,* — U.S. ——, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992). The order holding this case in abeyance is therefore vacated.

2. The date of the donation is still a matter of some dispute. The donation card carries a February 27, 1985, date, while the hospital blood inventory record shows a donation date of February 26, 1985. For clarity's sake, we will refer to February 27 as the donation date. We do not intend to take a position on any factual dispute about the actual date of donation.

3. Because these "interrogatories" are directed at a non-party, they are more properly characterized as "depositions upon written questions," Fed.R.Civ.P. 31. *See Belle Bonfils Mem. Blood Ctr. v. District Court,* 763 P.2d 1003, 1013–14 (Col.1988) (construing analogous state rules).

United States and the State of South Carolina." *Watson v. Medical University of South Carolina,* C/A 88–2844–18 (D.S.C. Feb. 25, 1991). Although couched in broad, general terms, the issues before us may only be meaningfully analyzed by reference to the particular discovery scheme embodied in the protective order.[4]

### A.

We begin by setting forth the pertinent legal standards under which the protective order should be reviewed. First, the district court is subject to the broad admonitions of Fed.R.Civ.P. 26(b) in fashioning discovery orders. All non-privileged information that is either admissible at trial or that "appears reasonably calculated to lead to the discovery of admissible evidence" should be discoverable. Fed. R.Civ.P. 26(b)(1). However, protection may be granted to any person from whom discovery is sought to prevent "annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c). On appeal, Red Cross asserts that the only standard of review should be *de novo* for its "claims of legal errors." What are put forth as "legal errors," however, are more accurately characterized as matters involving either fact-finding or an exercise of discretion by the district court. The Red Cross's attempt to paint this case in stark, urgent colors is unsuccessful.

We will follow the established standards of review.

> If the claim is of error in underlying factfindings which infected the ultimate decision, review must proceed under the clearly erroneous standard; if of error of law infecting the ultimate decision, under the *de novo* review standard. Only if the claim of error goes exclusively to the impropriety of an ultimate exercise of available discretion is review solely under the abuse of discretion standard.

*United Food & Commercial Workers v. Marval Poultry Co.,* 876 F.2d 346, 351 (4th Cir.1989). The threshold task throughout is to properly categorize the various aspects of the lower court's order as findings of fact, conclusions of law, mixed fact-law rulings, or exercises of discretion.

### B.

The Red Cross contends that Watson's interest in the discovery approved by the court is outweighed by two countervailing interests: the nation's interest in a safe and adequate blood supply and the implicated donor's privacy interests. We turn first to how the proposed discovery purported to pose a danger to the adequacy of the nation's blood supply.

The Red Cross's argument is that allowing plaintiffs to "enmesh" blood donors in tort actions of this kind will inevitably result in fewer persons willing to donate blood. As more cases of this type are publicized, potential donors will decide that the risk of becoming involved in litigation, with the possibility that their personal lives will be made public, outweighs the benefits of donating their blood. Although the Red Cross currently promises that the donors' records will remain confidential, such promises may not be able to be made if donor discovery is permitted in a sufficiently large number of cases like the instant one. Fewer donors, of course, means less blood.

Notwithstanding the Red Cross's repeated assertions to the contrary, however, the district court did not rule that Watson's interest in the contested discovery outweighed the public interest in maintaining an adequate supply of healthy volunteer blood. Rather, the court ruled that "there is not one shred of tangible evidence in the nature of hard statistical data to substantiate an otherwise speculative claim that the blood supply will be jeopardized." *Watson v. Medical University of South Carolina,* C/A No. 88–2844–18 (D.S.C. Feb. 7, 1991) (order). On appeal, the Red Cross attempts to deflect the impact of this ruling by pointing to a number of cases in which courts have denied discovery requests from similarly implicated donors. *See, e.g., Rasmussen v. South Florida Blood Service,* 500 So.2d 533, 538 (Fla.1987) ("[T]here is

---

**4.** The court's protective order in *Watson v. Medical University of South Carolina,* C/A No. 88–2844–18 (D.S.C. Feb. 7, 1991), is reproduced in the Appendix to this opinion.

little doubt that the prospect of inquiry into one's private life and potential association with AIDS will deter blood donation...."); *Coleman v. American Red Cross,* 130 F.R.D. 360, 362 (E.D.Mich.1990) ("There is no question that court ordered disclosure will have a serious impact on volunteer blood donations."). In none of these cases, however, is there any mention of any statistical or empirical underpinning for the stated concerns about the effect on the blood supply.

Of course, the Red Cross offered the opinion testimony of an expert in the field. Again, however, Dr. Cannon's opinions are couched in conclusory terms. His proffered syllogism goes like this: donors desire anonymity and confidentiality; "donors would be much less likely to donate blood if they knew there was a risk, however small, that their identities, medical histories, and test result might be revealed to the recipients of the blood;" therefore, blood supplies will drop to dangerously low levels. Aside from the fact that the identity of the implicated donor in this case is not to be revealed to Watson under the protective order, the expert opinion is grounded upon nothing more than a seemingly logical theory of human behavior. Moreover, Dr. Cannon's opinion is directly countered by Watson's expert, Dr. Eisenmann, president of the Association for Improvement of Volunteer Blood Donation.

In an affidavit filed with the district court, Dr. Eisenmann stated that "granting the plaintiffs' request for access to the implicated donor in the above captioned matter is extremely unlikely to have any measurable effect on the availability of blood for transfusion, and certainly not the major impact that Dr. Cannon supposes." Dr. Eisenmann concluded by stating that any effect on donors would be a salutary one because the safety of the blood supply might well be enhanced if potential donors at high risk for HIV were discouraged from donating out of fear of enmeshing themselves in litigation.

In sum, the opinions of courts and experts go both ways.[5] The district court's ruling rejected the factual predicate upon which the Red Cross's balancing test was premised, *i.e.,* that access to implicated donors would lead to a dangerous depletion of the blood supply because many potential donors would decline to donate out of fear of becoming involved in similar litigation.[6] We cannot say that this finding of fact is clearly erroneous. Having so decided, we need not balance the interest of plaintiff and the nation.[7]

### C.

The Red Cross makes a related argument about the potential effect on the blood supply. Donor screening depends in large part on receiving an accurate health history from each donor in order that high-risk persons be excluded. The Red Cross raises the specter of donors lying about their health histories in order that they be permitted to donate blood. Lying, of course, will neither insulate them from litigation nor will it bode well for them should their donations be implicated in the transmission of disease. It strikes us that a person willing to spend an hour or more so that a needle can be placed in his or her vein and a pint of blood extracted is not the sort of person who would lie for the privilege of doing so.[8] The potential for involvement in

---

5. See Note, *Transfusion–Related AIDS Litigation: Permitting Limited Discovery from Blood Donors in Single Donor Cases,* 76 Cornell L.Rev. 927 (1991), for a thorough and up-to-date compilation of the cases and articles on this subject.

6. We note that scientific advances in testing for the presence of the HIV antibody should serve to significantly reduce the number of donation-related cases in the future. Only weeks after Trevor received the transfusion of the implicated donor's blood, the Food and Drug Adminis-

tration approved the first such test. *See Rasmussen,* 500 So.2d, at 537 n. 10.

7. The nation also has a stake in seeing that victims of negligence are fully compensated by the responsible party. See *Belle Bonfils,* 763 P.2d, at 1012.

8. This reasoning applies only to voluntary donors. Paid "donors" have different incentives to give blood, and we strongly suspect that their level of candor in screening is governed primarily by the going price.

litigation will not be lessened by giving false answers during screening; if anything, such a lack of candor may well exonerate the donation center, while at the same time shifting the focus of liability to the donor where none might otherwise have existed. In short, the asserted fear is illogical.

## III.

The Red Cross also assails the district court's refusal to hold that the implicated donor's privacy interests should prevent even a limited disclosure of his identity and discovery. The district court believed that the protective order and the questions to be propounded did not implicate the donor's constitutionally protected privacy rights; alternatively, even if such rights are implicated, these rights are outweighed by the competing interest of the plaintiff in obtaining the information. We believe both of these holdings are correct.

## A.

■ We accept the contention that the Red Cross has standing to raise the donor's constitutional rights. *Doe v. American Red Cross Blood Services*, 125 F.R.D. 646, 650 n. 1 (D.S.C.1989). It is difficult, however, to discern the precise nature of the right that the Red Cross is seeking to protect. The Red Cross appears to identify two separate aspects of the purported right that would be violated if the discovery were to proceed as ordered. First, the possibility of inadvertent disclosure of the donor's identity might cause grievous harm to the donor. Second, the questions approved by the district court would embarrass and harass the implicated donor. We fail to see how the approved discovery affects either of these aspects of privacy in a manner prohibited by the federal or South Carolina constitutions.

The danger of *public* disclosure is a red herring. The Red Cross cites a slew of cases for the proposition that there is a protectable right to privacy in one's medical records. *See, e.g., United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3rd Cir.1980) ("There can be no ques-

tion that an employee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of personal materials entitled to privacy protection."). The stigma attached to AIDS lends even more weight to the argument that the medical records of its victims should receive scrupulously confidential treatment. *See Woods v. White*, 689 F.Supp. 874 (W.D.Wis.1988), *aff'd mem.*, 899 F.2d 17 (7th Cir.1990) (disclosure by state health employees to non-medical personnel that plaintiff-inmate had tested positive for AIDS held to state a claim for violation of inmate's constitutional right to privacy). The Red Cross's arguments fall short, however, when they are examined in the specific context of this case.

The Supreme Court gave short shrift to a similar argument in *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). A state statute required that the names and addresses of all persons who received prescriptions for certain drugs that were also sold illegally be recorded in a centralized computer file. Physicians and patients argued that the statute violated their constitutional rights of privacy because, among other reasons, there existed a possibility that the names of patients obtaining such prescriptions might be disclosed publicly. The Court found no evidence that the collection and storage of the information would be improperly administered by either the state or, in the event the stored data were to be used as evidence in a judicial proceeding, by the courts. Accordingly, the potential for *public* disclosure was held to be an insufficient basis for finding a violation of the rights of privacy. *Id.* at 598–602, 97 S.Ct. at 875–878.

The possibility of *public* disclosure is even more remote in the case before us. The implicated donor's identity, already known to the Red Cross, would be revealed to only the court and to the lawyer appointed by the court. The revelation to the court, moreover, is to be made directly to the judge by the Red Cross, to be hand delivered in an envelope marked "Personal and Confidential." All answers are to be maintained in a sealed envelope marked

"Confidential," and the answers provided by the donor must have the signature redacted prior to filing. We cannot conceive of a better system to maintain the confidentiality of the donor's identity. The potential for disclosure does not rise to the level of a violation of the privacy rights of the donor.[9]

## B.

The second aspect of a purported violation of privacy rights posited by the Red Cross is the potential that the questions approved by the district court will tend to harass and embarrass the donor. If the prescribed procedures were followed on February 27, 1985, the donor has already voluntarily submitted to a similarly intimate and probing interrogation.[10] To the extent that avoidance of embarrassment has a constitutional dimension in this context, it only involves the embarrassment and humiliation that might follow public disclosure that the donor is infected. *See Belle Bonfils Mem. Blood Ctr. v. District Court,* 763 P.2d 1003, 1012–13 (Col.1988). Embarrassment and feelings of harassment flowing from the very act of answering the questions simply do not implicate a protectable interest under the Constitution.[11] *Cf. Whalen,* 429 U.S. at 602, 97 S.Ct. at 878 (disclosure of private medical information to state health employees not "meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facts of health care"). At most, the invasion of the donor's privacy is minimal, and this interest is greatly outweighed by the plaintiff's need for the information and the related public interest in seeing that injuries are compensated.

## IV.

■ Red Cross makes the patently disingenuous argument that direct donor discovery should be prohibited because it will only generate irrelevant, inadmissible evidence. Despite the Red Cross's painstaking efforts to trivialize the approved interrogatories, the fact remains that there is only one person with any chance of remembering the details of that day over six years ago, and that person is the donor. We cannot help but think that the very asking of the questions, because it involves contact with the donor by someone other than the Red Cross, may indeed lead to the revelation that the donor is willing to testify at trial. In any event, we do not believe that the district court abused its discretion in approving the particular questions in its protective order.

A related attack on the relevancy of the questions is that they focus largely on the donor's thought processes and motivations. The Red Cross correctly frames the relevant liability issue as being whether the blood donor center followed its prescribed procedures in screening the implicated donor.[12] The approved questions can be grouped into three general categories:

(1) events of the specific screening process (questions 5, 9(a), 10, 11, 12, 16);

(2) the donor's history of blood donations/deferrals (questions 1, 7);

(3) the donor's motivations and thought processes (questions 2, 3, 4, 6, 8, 9(b and c), 17); and

(4) the donor's personal (non-donation-related) history (questions 13, 14, 15, 18).

The Red Cross only disputes the relevancy of the third and fourth categories.[13] We

9. We leave for another day the question of whether court-approved disclosure to a larger universe might violate the donor's privacy rights.

10. For instance, a prospective donor in 1985 was asked by the screening nurse whether he or she (the donor) had ever taken self-injected drugs or been exposed to anyone with AIDS.

11. Although the question certified to this court includes a reference to the Constitution of South Carolina, the Red Cross makes no argument

that the state constitutional protection of the right to privacy, embodied in S.C. Const. art. I § 10, is any broader than the federal constitutional right.

12. An independent basis for liability, one not involved in this appeal, is whether the prescribed procedure itself was adequate.

13. In its opening brief, the Red Cross includes question 1 among the purportedly irrelevant interrogatories. Question 1 asks about the total

review this issue of relevancy in the context of Fed.R.Civ.P. 26 for abuse of discretion.

The benchmark employed by the district court is whether the requested information "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(c)(1). On relevancy matters, the trial court has broad discretion. *See generally* 4 Moore's Federal Practice ¶ 26.56[1] (1989 and 1990–91 Cum.Supp.).

■ The inquiries into the implicated donor's reasons for not donating blood in the past and into his knowledge of AIDS-related risks does not strike us as irrelevant under Rule 26's "reasonably calculated" standard. The donor's knowledge of AIDS-related risks may prompt memories of having been told of such risks during a prior donation attempt, or he may remember receiving assurances during a prior donation attempt that incarceration or homosexuality were not disqualifying circumstances. Likewise, questions about his level of education bear on the screening process; if he was obviously illiterate, the regular screening process should have been explained orally. An oral explanation would probably have taken longer than if he were able to read the information, and the duration of the entire process might be relevant to the question of the adequacy of the procedures employed on February 27. We find no abuse of discretion.[14]

## CONCLUSION

Acceptance of the Red Cross's arguments would amount to a grant of virtual blanket immunity from donation-related liability. The plaintiff is seeking information about events that occurred more than six years ago, from the only person who might remember. There can be no question that what happened during the donor screening process is crucial to the plaintiff's claim that the Red Cross was negligent in failing

number of donations by the donor; this is clearly relevant inasmuch as it may lead to other records pertaining to the donor.

**14.** The Red Cross also argues that the approved method of discovery is not authorized by the

to defer the implicated donor. Whatever privacy interests that are involved are protected by the district court's order. The contention that this discovery will contribute to a decline in the adequacy or the safety of the blood supply is a matter of some dispute, but we cannot say that the district court's findings are clearly erroneous. We believe the limited discovery approved by the district court should proceed.

AFFIRMED.

## APPENDIX

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

C/A No. 88–2844–18

Entered 2–7–91

Cynthia E. Watson, as Administratrix of the Estate of Trevor J. Watson, Deceased, Plaintiff,

vs.

Medical University of South Carolina and Lowcountry Red Cross, Defendants.

PROTECTIVE ORDER

Pursuant to its February 6, 1991 Order, this Court hereby approves the following procedure to be implemented in conducting discovery from Donor 58F03540.

Within 10 days of the execution of the February 6, 1991 Crier, the defendant American Red Cross shall supply directly to the undersigned District Court Judge, the name and address of the donor. This information will be supplied in a letter marked "Personal and Confidential" and will be hand-delivered directly to the judge's chambers.

All information obtained pursuant to this Order shall be maintained by the Clerk of Court in a sealed envelope marked "confi-

rules of civil procedure. Rule 31, as modified by the protective order entered pursuant to the provision of Rule 26(c), is clearly ample authority for the court's protective order. See note 2, *supra.*

dential" and indicating the confidential nature of the information contained therein, and prohibiting on pain of contempt the opening of the envelope without express prior approval from this Court.

This Court shall, in a separate order, appoint an attorney for the donor, at plaintiff's expense, which cost shall be taxable (if applicable) at a later date. The name of this attorney shall be maintained confidentially in the same manner as the name of the donor information. This appointed attorney shall *immediately* notify the donor of his or her representation and the confidential nature of his representation and the Order of this Court.

Plaintiff has submitted proposed questions, to which the defendant has objected. This Court has reviewed those questions, and hereby finds that the following questions may be asked of the donor. The verified copy of the answers shall be filed under seal with the Clerk of Court and a copy of the answers with the verification redacted shall be provided to the parties. Upon appointment, the donor's attorney shall immediately contact the donor for the purpose of obtaining discovery of the answers to these questions.

1. On how many occasions in your life have you donated blood?
2. Thinking back now to February 26 or 27, 1985, to the best of your recollection, were you aware at that time that donated blood can sometimes transmit disease to a patient who receives that blood in a transfusion?
Yes____ No____ Cannot recall____
3. If you were aware on February 26 or 27, 1985 that donated blood can sometimes contain disease organisms, which diseases did you think could be spread by blood transfusion?
4. a) On February 26 or 27, 1985, did you think you were at any risk for any of those diseases?
Yes____ No____ Cannot recall____
(If your answer is no, go to question 5.)
b) What diseases did you think you might be at risk for?
5. When you gave blood on February 26 or 27, 1985, were you asked about any diseases or behaviors or experiences that put you at risk for these diseases?
Yes____ No____ Cannot recall____
6. a) Before February 26 or 27, 1985, had you ever purposely stopped giving blood for a period of time?
Yes____ No____ Cannot recall____
(If no, go to question 7)
b) How many times before February 26 or 27, 1985 did you consciously suspend blood donation?
c) For each time you suspended giving blood, what was the reason?
7. a) Thinking back to all the times you volunteered to give blood, was there any time that your blood was not accepted?
Yes____ No____ Cannot recall____
(If no, go to question 8)
b) What reasons were you given, and how long were you told to wait before again trying to give blood on each of these occasions that you were disqualified as a blood donor?

| Mo./Yr. | Reasons for Disqualification (Deferral) | Length of Deferral Period |
|---|---|---|
| | | |
| | | |

8. Were you at all concerned on February 26 or 27, 1985 that you might be at risk for HIV infection (infection with Human Immunodeficiency Virus) or AIDS?
Yes____ No____ Cannot. recall____
9. On February 26 or 27, 1985, in the course of your preparing to give blood, did the Red Cross staff or volunteers give you any written or verbal information about AIDS risks?
Yes____ No____ Cannot recall____

a. Did this information mention the particular risk that you have just identified as probably having been how you became infected?
Yes____ No____ Cannot recall____

b. Did you realize at the time that you were a any risk and should not give blood?
Yes____ No____ Cannot recall____

c. Why, if you realized that you should not give blood, did you go ahead with your donation?

10. I am now giving you a copy of the literature that the Red Cross says that they were giving to all donors on February 26 or 27, 1985. Please look it over. Were you given this literature to read, or did someone read it to you, on February 26 or 27, 1985?

11. I am now giving you a copy of the donor history card that you signed on February 26 or 27, 1985. It appears that you discussed a trip to the Orient with the nurse. Do you recall how the topic of your travel to Japan and China came up?
Yes____ No____ Cannot recall____
If answer is cannot recall:

a. Was that in response to a question about travel to areas were malaria is common?
Yes____ No____ Cannot recall____

b. Did you discuss with the personnel drawing your blood any other question regarding your eligibility to donate blood at that time?
Yes____ No____ Cannot recall____
If answer is YES:

a. What were those questions?

b. Did *you* raise them or did the person(s) interviewing you bring them up?

12. Do you recall what date you donated blood to the Lowcountry Red Cross in February, 1985?
Yes____ No____ Cannot recall____
If answer is YES:

a. What date did you donate blood to the Lowcountry Red Cross in February, 1985?

b. How do you recall the specific date (was it your birthday; was it your wedding anniversary, etc.)

13. On February 26 & 27, 1985 could you read?
Yes____ No____ Cannot recall____

14. In February, 1985 what was your level of education, i.e., what grade in school had you completed?

15. What is your date of birth?

16. On February 26 or 27, 1985, did the American Red Cross staff provide you with a private place so you could tell them in privacy any concerns you had about your donating blood?
Yes____ No____ Cannot recall____

17. Why did you proceed to donate blood on February 26, or February 27, 1985? (Check any that apply.)
_____I did not know that I was in a high risk group for AIDS.
_____I was not provided private area to confidentially disclose being in high risk group for AIDS.
_____I thought it would be opportunity to be tested for AIDS.
_____I knew I was in a high risk group for AIDS but had a great desire to donate blood.
_____I did not know blood would be used for blood transfusion into a patient.
_____Others (please specify).

18. Had you ever been an inmate in a state prison or local jail prior to 2/27/85?
Yes____ No____ Cannot recall____

---

Plaintiff, defendant, and counsel for all concerned are directed by this Order not to disseminate any information learned about the donor or his appointed counsel to any party without further order of this Court. The Court will employ all means to safe-

guard the privacy rights of the donor while at the same time allowing the plaintiff to proceed with discovery on a limited basis under the supervision of this Court.

The plaintiff may seek leave of the Court to present one set of follow-up questions to the donor, but all discovery of the donor shall be completed within 45 days of this Order.

IT IS SO ORDERED.

DAVID C. NORTON
United States District
Judge

February 6, 1991

WIDENER, Circuit Judge, concurring:

I concur in the result and in much of Judge Hall's opinion.

I do not agree, however, with certain parts of that opinion, none of which are necessary to the result obtained. These parts follow.

On page 487 in Part IIIA of the opinion, I do not accept the contention that the Red Cross has standing to raise the donor's constitutional rights. That one man may not raise the constitutional rights of another is well settled. e.g., *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Neither reason nor precedent requires a departure here, and it is at once apparent that the Red Cross has standing to take positions in litigation which it conceives would protect its blood supply, out of which protection these peripheral questions have arisen. Indeed, the question of the standing of the Red Cross has not been raised in the briefs.

Especially in the first paragraph of Part III of the opinion, and perhaps elsewhere, the opinion may be read that a blood donor or seller of blood has some kind of a constitutionally or otherwise protected privacy right which must be outweighed by the interest of the plaintiff in obtaining the information. I do not agree with any such implication.

I do not believe that a donor or seller of blood who has AIDS or any like disease which may be communicated by his blood, has any kind of a privacy right, constitutional or otherwise, which would protect him against the full disclosure of his knowledge with respect to the disease in himself and others, as well as his physical condition and everything about the taking and handling of his blood. I believe that such a donor or seller of blood has no right of privacy with respect to a disease that his blood transmits to another. To hold otherwise would only lend constitutional or other like protection to a corruption of our national blood supply. The confinement by the district court of the knowledge sought by discovery to those needing to know, under FRCP 26, is at least as much protection, if any, the donor or seller is entitled to, and the extent or existence of any such protection is a question we do not have to, and do not, decide.

RUSSELL, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion. I am convinced that the public interest in maintaining a safe and adequate blood supply and the privacy interest of the blood donor outweigh the plaintiff's interest in deposing the donor in this case. Even the restricted discovery permitted by this Court does not adequately protect these important interests.

Initially, I disagree with the Court's minimization of the interests asserted by the Red Cross. I would adopt the reasoning of the several federal and state courts that have protected the identity of HIV-infected blood donors from discovery, even by the court for the purpose of taking "veiled" depositions. These courts have recognized "that the prospect of inquiry into one's personal life, medical history, and potential association with infectious diseases such as AIDS is the kind of disincentive that could have a serious [adverse] impact on the nation's supply of voluntary blood." *Doe v. American Red Cross Blood Services*, 125 F.R.D. 646, 653 (D.S.C.1989); *accord Bradway v. American National Red Cross*, 132 F.R.D. 78, 80 (N.D.Ga.1990); *Coleman v. American Red Cross*, 130 F.R.D. 360, 362

(E.D.Mich.1990); *Rasmussen v. South Florida Blood Service*, 500 So.2d 533, 538 (Fla.1987); *Laburre v. East Jefferson General Hospital*, 555 So.2d 1381, 1384–85 (La. 1990). Unlike the district court and the majority in this case, these courts do not require "hard statistical data" to substantiate the claim of a diminished blood supply before weighing such claim in the balance of interests. *See ante*, at 485. Such data, it seems, would only be available by actually subjecting donors to a threat of litigation and then documenting the effect on the blood supply. The potential cost is not worth the certainty in knowledge. We can rely on common sense notions of human behavior to conclude that the Red Cross's logical claim in this regard deserves substantial consideration.

I also disagree that the Court's decision adequately protects the implicated donor's privacy interests. The donor's identity and medical condition will be revealed involuntarily to several people, including the judge, the judge's staff, the attorney appointed to represent the donor's interests, and that attorney's staff. During the course of the litigation, the donor will receive correspondence and/or telephone calls regarding the litigation, will likely have to meet with the attorney appointed to represent the donor's interests, and will have to take time to respond to Watson's written questions. Such involvement will not escape notice by family, roommates, intimate acquaintances, and possibly even employers, and will risk further exposure of the donor's personal medical information. The only certain protection of the donor's privacy interests comes through an absolute prohibition on discovery of the donor's identity.

Finally, I disagree with the majority's conclusion that Watson's interest in discovery outweighs society's interest in a safe and adequate blood supply and the donor's privacy interests in this case. Watson already has adequate information to proceed with her suit. The Red Cross provided a copy of the screening questionnaire completed by the donor, as well as other relevant donor information known to the Red Cross. In addition, Watson was permitted to depose the nurses involved in taking the donor's blood. The incremental information Watson might discover from deposing the donor is simply not worth placing the nation's blood supply at risk or offending constitutional privacy protections. Under these facts, the interests asserted by the Red Cross far outweigh Watson's need to depose the donor.

The majority opinion notes that new blood testing procedures were implemented in 1985, which, because of their accuracy, should significantly reduce the number of blood transfusion HIV suits. *Ante*, at 486, n. 6. Thus, future donors should have little fear of involvement in litigation. However, it seems that as science advances, so do diseases, ensuring a constant supply of blood transfusion cases. A few doctors have recently reported cases of an AIDS-like disease in patients who test negative for the two known HIV viruses. It is not yet known if the disease can be transferred through blood transfusions. Donald G. McNeil, Jr., *Once Again, the Disease Confounds Science*, N.Y. Times, July 26, 1992, Section 4, at 2 (national ed.). If so, we may again see an increase in blood transfusion litigation.

For these reasons, I do not join the opinion of this Court. Accordingly, I would not affirm the district court's order compelling discovery.